Alfred DURHAM, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–743.

District of Columbia Court of Appeals.

Argued Sept. 16, 1997.

Decided Dec. 30, 1999.

Robert O. Goff, for appellant.

L. Jackson Thomas, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas C. Black, Richard J. Nelson, and Maureen Bailey, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and RUIZ, Associate Judges, and LONG, Associate Judge, Superior Court of the District of Columbia.*

* Sitting by designation pursuant to D.C.Code

LONG, Associate Judge:

Appellant raises two issues in his quest for a reversal of his convictions for distribution of cocaine (D.C.Code § 33–541(a)(1) (1993)) and possession with intent to distribute cocaine ("PWID") (D.C.Code § 33–541(a)(1) (1993)). One issue focuses upon the trial court's refusal to give a certain jury instruction that was based upon a novel "theory of the case." The other issue embraces a fact-bound dispute over the admissibility of certain police testimony under the rubric of *Toliver v. United States,* 468 A.2d 958 (D.C.1983). Based upon the following analysis, we find no cause to reverse appellant's conviction on either basis. We treat each issue separately in light of the pertinent facts recapitulated herein.

### I. RELEVANT FACTS

For ease of understanding, it is not necessary to recount the minutiae of the entire case that unfolded before the jury. Instead, we highlight those facts that are pertinent to the resolution of the specific issues raised by appellant.

It suffices to say that appellant was arrested because the police observed him engaged in an act of transferring cocaine from himself to another individual. The arrest of Alfred Durham was an example of a rather common scenario in which a police arrest team stops an individual pursuant to a radio lookout description broadcast by another officer who had been watching that person from an observation post. This is exactly what happened to appellant. The arrest team took action because of the appellant's activity that had been observed by Officer Jerry Thomas Moomau, while he was on duty nearby and out of sight.

Moomau was in his observation spot at approximately 5:25 p.m. on July 21, 1995. The record does not identify his precise location, but at least reveals that he was somewhere in the 5500 block of South

§ 11–707(a) (1995).

Dakota Avenue, Northeast, in the District of Columbia. Upon arriving at his observation post, Moomau quickly noticed certain behavior that convinced him to watch appellant carefully. Using binoculars and taking advantage of daylight conditions, he noted that appellant walked up and down the block, only stopping to walk over to a car that pulled up, lean into the car, and then reach inside the car with his hand.

Moomau could not see exactly what appellant had inside of his hand, and he did not actually see appellant receive any money. Nonetheless, he sensed that he had witnessed a drug transaction. He decided to continue watching Durham. The officer testified:

> Well, I felt that was a drug transaction, but I couldn't really articulate it to see what he did with his hands. So, we didn't stop the car or anything like that. We let the car go, but it drew our attention to him more at that point to watch him.

Officer Moomau never lost sight of appellant. Moomau's period of observation was short. The second apparent drug transaction involving appellant occurred within 15 or 20 minutes of Moomau's entry into the observation post.

Shortly after the initial sighting of appellant, but still within this relatively short window of time, Officer Moomau saw a man later identified as Walter Thomas approach the appellant. Durham was then standing in the middle of the block. Appellant reached inside the right side of his own pants, pulled out a small object with his hand closed, and gave it to Thomas. The officer was able to see Thomas receive the object with his left hand and put his left hand into his own left pocket.

When Thomas walked away, Moomau radioed a lookout description for both men. Once they were stopped by other officers,

Moomau confirmed that these were the same two men that he had observed. Appellant was stopped only one door away from where the hand-off had occurred between himself and Thomas. A quantity of cocaine (also in three ziplock bags) was found by police in the clothing of Walter Thomas. Another three ziplock bags of cocaine and a fifty dollar bill were seized from the clothing of appellant.

At trial, the testimony of Moomau and the arrest team members was accompanied by expert testimony from Detective Charles Culver. Having been qualified as an expert in the subject of distribution of illicit drugs, he testified that the cocaine found on Alfred Durham contained a total of .360 grams of crack cocaine of 79 percent strength. The crack cocaine that was seized from Thomas contained a total of .279 grams of crack with an 80 percent strength and a street value of $60.00.

The expert also explained to the jury that drugs are not always exchanged for money, but that drugs are frequently exchanged for acts of prostitution or other services.

Appellant's contentions regarding the disputed jury instruction must be evaluated in light of the defense testimony that was the basis for requesting this particular instruction. Appellant was the sole defense witness. We summarize that testimony as follows.

Essentially, appellant testified to explain why he had been found in this particular block, why he had been in possession of drugs, and what his intentions had been on this occasion.[1] Appellant basically portrayed himself as a person who washed and repaired cars "on the street" for people who were known to him. He claimed that he had been in this particular block for most of the day, engaged in washing and waxing a vehicle for an employer.[2]

---

1. Originally, appellant and Thomas were indicted together as co-defendants. The trial court granted a motion to sever defendants

argued by Thomas just prior to the selection of the jury.

2. Appellant identified the employer as Estelle Brim. She did not testify. In any event, Moo-

He elaborated that Walter Thomas was a man who owed him money for similar services.

According to appellant, he had replaced the brakes on a car owned by the girlfriend of Walter Thomas and that he had performed this service approximately two weeks earlier. Appellant asserted that Thomas owed him the sum of $50.00 for this work, and that their discussion of payment of the debt was the explanation for being seen with Thomas on the date of his arrest.

Durham told the jury that on the afternoon of his arrest, Walter Thomas came into the block and went directly inside of a barber shop. Soon, Thomas exited the barber shop and handed three small rocks of cocaine to appellant. In his testimony, appellant implied that Thomas handed him the drugs in an attempt to extinguish his girlfriend's $50.00 debt. Durham did not report any preliminary conversation about the debt, however.

Thomas told appellant to check out the cocaine to see whether he wanted it. In order to do so, appellant left the sidewalk area and went to the rear of the building so that he would not be "on display." Meanwhile, Thomas re-entered the barber shop to get a haircut.

After examining the rocks of cocaine, appellant decided that the rocks were not to his liking because of their color. He testified, "The color of it. When you were just observing the color of it, it didn't look that good to me.... It's too white." He also was skeptical about the drugs because he did not believe that they were actually worth $50.00. Durham then went to the barber shop to find Thomas. Upon doing so, Thomas told him to wait further.

Durham interjected that the first incident that Officer Moomau had described as a probable drug transaction had been nothing of the kind. Appellant testified that this had been an innocent situation in which a friend had pulled up, complaining that he had a leak in his car, asking appellant to fix it. This allegedly occurred while Durham was waiting for Thomas to emerge from the barber shop. Appellant claimed that he and the friend discussed the problem, with appellant eventually telling the man that a certain part would be needed. Appellant testified that the friend agreed to obtain the part and to call back at a later time.

The "friend" pulled away. However, Durham remained in the neighborhood and spent time purchasing lottery tickets at a nearby liquor store, while continuing to wait for Thomas.

When Thomas finally came out of the barber shop, appellant told him that he did not want the crack cocaine that Thomas had given him. At that point, according to Durham, he handed the cocaine back to Thomas, and Thomas immediately gave him a fifty dollar bill in payment of the debt.[3] According to Durham, Thomas simply departed the scene.[4]

Durham also gave the jury his explanation for the crack cocaine that was found in his clothing. He asserted that the three ziplocks seized from him had been given to him by someone other than Thomas, as payment for changing the oil and flushing the radiator of that other person's car earlier in the day. Appellant testified that he was a longtime drug user and that he had planned to ingest these particular drugs after he received his money from Thomas. Durham added that he often obtained drugs for his personal use, either by purchasing the drugs with cash or by

mau testified that appellant was not washing any car during the period in which he was observing this block.

**3.** Ostensibly, this was appellant's attempt to explain the hand-to-hand transfer of drugs that had been observed by Officer Moomau.

However, Moomau had never claimed to have seen anything such as money given by Thomas in exchange for drugs.

**4.** He claims that Thomas made no attempt to convince him to keep the drugs.

bartering his car repair services in exchange for drugs.

Appellant contended that the drugs seized from Thomas were the same drugs that he had handed back to Thomas. Despite his claim that the color of the cocaine had been unacceptable, he acknowledged on cross-examination that he could not now tell the difference between the drugs seized from him and the drugs seized from Thomas.

In its rebuttal case, Officer Darnell Garvin testified that appellant had told him that he "showed" drugs to Thomas—not that he had handed any drugs to Thomas. Furthermore, another officer (Investigator Colleli) testified that he had observed appellant from a second observation post directly across the street from the block where appellant was found. Colleli related that he never saw appellant washing or waxing a car and never saw him go into any liquor store.

## II. THE DISPUTED JURY INSTRUCTION

Appellant complains that his convictions must be reversed because the trial court erroneously declined to give a particular "theory of the case" instruction. The specific instruction that was requested read as follows:

> Defendant, Alfred Durham, has presented testimony that he received cocaine from Walter Thomas as possible payment for a debt Mr. Thomas owed to Mr. Durham, and that after examining the cocaine Mr. Durham returned it to Mr. Thomas and received $50 in cash as payment for Mr. Thomas's debt.

If you believe the defendant's theory of the case you must find him not guilty of Count I, distribution of cocaine. *Long v. United States*, 623 A.2d 1144 ( [D.C.] 1993); *United States v. Swiderski*, 548 F.2d 445 (2d Cir.1977).

Not surprisingly, the prosecutor opposed the request for this instruction, arguing that it misstated the law. The trial court fundamentally agreed with government counsel that even if appellant physically received the drugs from Thomas and later returned them to Thomas, the act of returning the cocaine was sufficient to constitute "distribution."

■ Defense counsel argued that Durham's act of handing back the cocaine to Thomas was not a "transfer" within the meaning of the statute. Counsel contended that it was no more than an "incomplete distribution." The trial judge ruled that this theory, as set forth in the requested instruction, was not a recognized defense under the Code's definition of "distribution." We agree.

■ The trial judge eventually gave the jury one part of the requested instruction, even though this decision was insufficient to satisfy defense counsel. The judge read to the jury only the first paragraph, as quoted herein above.[5]

■ The instant litigation focuses on the practical application of the bedrock rule that a criminal defendant is entitled to have the judge instruct the jury on his or her legal theory of the case. The right to such an instruction flows from a threshold finding by the trial court that the proffered defense is a "recognized defense for

---

5. The revised instruction, as given by the trial judge, was a generous gesture to the appellant, because it was nothing more than a quick gist of appellant's testimony. The judge correctly could have declined to give the requested instruction in its entirety. Appellant was not entitled to an instruction that does no more than rehearse or summarize the defense evidence, because this would give special emphasis to the defendant's testimony. *Montgomery v. United States*, 384 A.2d 655, 660 (D.C.1978). Moreover, the District of Columbia Circuit has observed that an instruction to a jury to acquit the defendant if his denial of guilt is believed cannot be elevated to the status of a "theory" of the case. *See Laughlin v. United States*, 154 U.S.App.D.C. 196, 206–207, 474 F.2d 444, 454–455 (1972). This purported "theory" is effectively what the final version of the instruction communicated to the jury.

which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988); *Minor v. United States*, 623 A.2d 1182, 1185 (D.C.1993).

The precise dispute in this litigation is whether this appellant's defense theory is indeed a "valid" defense to the charge of "distribution" of cocaine under our statutory definition. Based upon the following analysis, we hold that it is not. Even viewing the evidence in the light most favorable to the appellant, there was no error in the trial court's decision to decline to give the second portion of the requested instruction.

■ The Code defines "distribution" as the "actual, constructive, or attempted transfer from one person to another other than by administering or dispensing of a controlled substance, whether or not there is an agency relationship." D.C.Code § 33–501(9). In turn, the term "transfer" has been found by this Court to bear the same meaning as the dictionary meaning, " 'to carry or take from one person or place to another.' " *Long, supra,* 623 A.2d at 1147, quoting Philip B. Gove, Webster's New International Dictionary 2426–27 (1986). Appellant's actions fit neatly into the statutory definition of a "transfer." Appellant's return of the cocaine to Thomas constituted the express, physical act of distributing the cocaine. During the time that he was examining the drugs, appellant had "practical control" of this cocaine. When he returned it to Thomas, the "transfer of actual control" occurred anew. *See Long, supra,* 623 A.2d at 1148. Durham's admission of the hand-off corroborated the key police testimony that described appellant as reaching into a pocket and handing an object to Thomas.

The appellant, in making his transfer of the drugs to Thomas, was effectively putting the drugs back into circulation for potential use by others or for further distribution, and this is certainly what our Code seeks to punish as "distribution."

Durham, in his trial testimony, did not purport to know what Thomas would do with the drugs that he handed back to him. The fact that Thomas was actively using drugs interchangeably as cash is more than enough to establish that appellant's hand-off reinserted the rocks of cocaine into the stream of commerce.

■ In any event, we held years ago that any act of giving narcotics to another person constitutes an act of unlawful distribution. *Wright v. United States,* 588 A.2d 260, 262 (D.C.1991). The prosecutor need not prove that a sale took place, for example. This is elementary. Moreover, this Court construes the term "distribute" literally, because the Code itself does not distinguish among types of transfers between parties. *Long, supra,* 623 A.2d at 1147. The Code simply makes no provision for motive-driven defenses to criminal liability for any drug offense. The Council did not intend to enact or permit any such loophole.

Casting appellant's testimony in its best light, his ultimate dissatisfaction with the quality of the cocaine is an assertion that only elucidates the debtor-creditor issue. Durham's *post hoc* rationalization for handing back the drugs is totally irrelevant to the fact that he transferred the cocaine from himself back to Thomas. We hold that his assertion of a personal reason for making the transfer of the drugs to Thomas is not a legally cognizable basis for a defense, and he was therefore not entitled to the jury instruction that he demanded.

We have scrutinized the points and authorities cited and argued by appellant, and we do not find them to be persuasive. As a threshold matter, it is important to note that appellant does not provide any legal authority to establish that a "recognized defense" exists as he has formulated it. Rather, he appears to rely principally upon inapposite conclusions from an opinion of the United States Court of Appeals for the Second Circuit. The case he cites

is *United States v. Swiderski*, 548 F.2d 445 (2d Cir.1977).

The facts of that case are distinguishable from the underlying facts herein, and *Swiderski* is therefore not instructive. While we do not seek to inflate the importance of *Swiderski* by dwelling upon it, we pause to discuss it in detail only because of appellant's heavy reliance on that opinion.

The defendant in *Swiderski* was convicted by a jury of the offense of possession of cocaine with intent to distribute. There was no conviction for the crime of distribution. The appellant therein testified that he and his fiancee had jointly purchased drugs from another person while inside of an apartment and that they did so in order to "get high."[6]

The Government's own evidence showed that defendant and his fiancee had acted as a pair in purchasing a quantity of cocaine for $1,250.00. Appellant was the person who made the actual purchase. He and his fiancee immediately sampled the drugs while still inside the apartment. A physical transfer had occurred from one person to another in the course of their sampling. *Id.* Soon after the episode inside the apartment, the two drove a van away from the apartment building. They both alighted from the van and were arrested while together on the street. Thereupon, the law enforcement officers seized a quantity of drugs from the fiancee. There was no proof at trial that they actually had passed any drugs to any third persons, despite testimony from the government informant that they had articulated a plan to sell the drugs to other people.

The conviction was reversed because of what the Second Circuit determined to be an erroneous jury instruction, combined with the effect of the prosecutor's theme in closing argument. The trial court in *Swiderski* had instructed the jury that giving or passing cocaine to a "friend" or "fiancee" constitutes "distribution." *Id.* at 448–49.[7]

The Circuit Court panel focused on the uniquely close relationship between Swiderski and his cohort. The Circuit concluded that "the mere existence of joint possession by two closely related persons—here an engaged couple who later married one another—is alone not enough to provide the basis for such an inference [of intent to distribute]." *Id.* at 449. The Second Circuit also focused upon the couple's ingestion of some of the drugs while still inside the apartment. Overall, the appellate court assumed *arguendo* the truth of their claim that they arrived at the apartment for the exclusive purpose of immediately using the same drugs that they purchased.

Appellant herein seizes upon a certain passage in *Swiderski* as supportive of his own position. He cites the Circuit's observation that Congress, in enacting the Comprehensive Drug Abuse Prevention and Control Act, sought "to distinguish between one who acts as a link in the chain of distribution and one who has already acquired possession for his own use." *Id.* at 451. The Circuit Court warned, however, "Our holding here is limited to the passing of a drug between joint possessors who simultaneously acquired possession at the outset for their own use." *Id.* In the instant case, it was appropriate to refuse to give the full proffered jury instruction because the facts that were admitted by

---

**6.** There was evidence, however, that this was not their exclusive plan. The trial evidence in *Swiderski* contained testimony that defendant's fiancee had stated that the cocaine at issue was not good enough for their personal use and that they had identified a buyer. 548 F.2d at 448. The Second Circuit, however, assumed for the sake of discussion that the contention of the appellant should be accepted at face value for purposes of evaluating whether the trial court had incorrectly instructed the jury.

**7.** In a note sent to the court during deliberations, the jury had asked whether it was necessary that a third person had been involved in this scenario as the intended distributee. In effect, the judge answered the question in the negative.

appellant squarely placed him as a proverbial link in the chain of distribution.

Appellant implies that he was entitled to the jury instruction that was demanded because, like the scenario proffered by the defense in *Swiderski,* any transfer of the drugs was only related to his personal possession of such drugs. He further implies that he did not intend for those drugs to travel any further than its original "owner," Thomas, if appellant had decided not to keep them. We cannot build this kind of bridge between *Swiderski* and the instant case, because proprietary relationships have never had a place in the analysis of distribution cases in our jurisdiction.

Furthermore, the concept of ownership or the permanency of ownership has never been determinative of criminal responsibility for the illegal possession or distribution of drugs. Even if appellant was only a bailee of some kind, his conduct still falls within the definition of distribution if he transferred the drug to any other person after he physically received it.

Appellant's reliance upon *Swiderski* misses the mark. In the instant case, in contrast to the facts in *Swiderski,* appellant certainly did not transfer the cocaine back and forth with Thomas as part of a scheme to obtain drugs for their mutual, immediate enjoyment.[8]

For all of the reasons explicated above, *Swiderski* is readily distinguishable and should have no impact upon our decision.

Irrespective of opinions like *Swiderski* from the federal courts or elsewhere, we are required to follow the holdings of pre-existing case law in our own jurisdiction. The decision in *Swiderski* is at variance from the law in the District of Columbia, because in post-*Swiderski* opinions, rulings of this Court fully support the Government's interpretation of the definitions of "transfer" and "distribution."

Several exemplary cases from our own Court provide controlling precedents. They emphasize the strict definition of "distribution" in the context of PWID prosecutions. That definition, of course, remains identical when the charge is distribution.

In *Wright v. United States, supra,* a panel of this Court affirmed convictions for possession with intent to distribute cocaine and phencyclidine (PCP) in a case in which appellant was arrested in possession of a pouch containing 13 tinfoil packets of marijuana laced with PCP and a container bearing three ziplock bags of cocaine. He had been displaying a tinfoil to two other individuals on the street just prior to his arrest. The Government's evidence included testimony that defendant had admitted that he had intended to share the drugs with a friend.

■ As we noted earlier herein, a prior panel of our Court restated the principle that "giving or sharing drugs with another constitutes distribution under the law, and an intention to share is evidence of an intent to distribute." *Wright, supra,* 588 A.2d at 262, citing *Chambers v. United States,* 564 A.2d 26, 31 (D.C.1989). In *Chambers,* a panel of this Court affirmed convictions for possession with intent to distribute cocaine and distribution of cocaine. The distribution count related to an incident in which the police directly observed the defendant selling a quantity of drugs to an undercover policeman. Ernest Chambers had been working as a team with his co-defendant Martha Hubbard. *Id.* at 27. The PWID count against Chambers related to three tinfoil packets

---

8. Another contention that misses the mark is appellant's characterization of his actions as an "incomplete distribution." He had argued this point to the trial judge as part of his demand for the jury instruction that was not given. Appellant unwisely relies upon this terminology, because the Code includes any "attempt" as a violation of law that is co-equal with actual distribution. The concept of "attempted transfer" is so broad that it would surely include any transfer that was effectuated for reasons such as buyer's remorse or any kind of regret for initially accepting drugs.

of cocaine that were found in his pockets after arrest.

The appellant in *Chambers* testified at trial that he had planned to share the cocaine with Hubbard (who had been arrested with him). *Id.* at 28. The panel observed, "Since such sharing would have been a distribution, Chambers' own testimony proved an intent to distribute." *Id.* at 31. Further, we noted, "Chambers' testimony that he planned to share the cocaine with Hubbard was a judicial admission of an intent to distribute." *Id.* at 31 n. 10.[9]

Today, we are also constrained to say that the rejected portion of the instruction that was requested by Durham did not even capture the real theory of the defense as it should have been articulated, *i.e.,* that appellant was not a link in the chain of distribution because he never intended to be more than a mere possessor. Based upon the actual wording of the requested instruction, combined with appellant's corresponding testimony, the first half of the instruction was effectively a judicial admission of guilt. This is because, like the testimony in *Chambers*, the defense testimony and proffered instruction herein did no more than recite the facts constituting a distribution—and the reasons for which the distribution was committed. It did not set forth a "theory" that would negate criminal liability itself.[10]

More recently, in *Malloy v. United States*, 605 A.2d 59 (D.C.1992), we reiterated that "the statute does not distinguish among types of transfers between parties,

*i.e.,* sales to third persons or ... deliveries between a dealer and a courier." *Id.* at 61. Today, as then, no distinction means no distinction.

We cannot overrule or disavow the conclusions already embraced in *Chambers*, *Wright,* and *Malloy* on the subject of whether transfers for the purpose of personal sharing of drugs constitutes an illegal act of distribution. The pronouncements in all three cases clearly preclude a reversal herein today.

■ Finally, appellant urges us to rule in his favor by following the suggestions in the dissenting opinion in *Lowman v. United States*, 632 A.2d 88 (D.C.1993) (Schwelb, J. dissenting). In the dissent, there was an invitation to judicially devise a way to lessen the harsh effects of the Code on people like Alfred Durham. We reject this invitation, for good reasons.

In *Lowman,* a panel of this Court affirmed the appellant's conviction for distribution of cocaine. The jury convicted Lowman as an aider and abettor to a principal distributor of drugs. She aided and abetted the sales by steering customers to another person who was selling cocaine. More precisely, the appellant therein "brought the buyer to the seller, asked the seller if he had drugs in the quantity sought by the buyer, remained during the actual sale, and left almost immediately after the sale." *Id.* at 91.

The dissent stated that "if everyone who assisted a buyer of drugs were thereby

**9.** The appellant in *Chambers* sought a reversal because the trial judge had failed to give a *sua sponte* instruction on the elements of simple possession, during the prosecutor's closing argument. We found no error because "there was no basis in the evidence for such an instruction as to Chambers" and because the issue was raised for the first time on appeal. *Id.* at 31 n. 11.

**10.** Because the instruction that was rejected by Judge Diaz did not accurately articulate the defense anyway, there could not have been any harm resulting from the trial court's refusal to give this portion of the instruction.

While we do not regard the judge's ruling as error of any kind, including harmless error, it was a harmless decision nonetheless. In the instant case, the proposed instruction was relevant (if at all) only to the PWID count. This is because the drugs seized from appellant's pocket were the only drugs for which he could fairly claim to be a mere possessor. Those were the drugs on which the PWID count was premised. Yet, ironically, the PWID charge was not the count for which Durham's proposed instruction was proffered to Judge Diaz.

rendered a distributor, then, *a fortiori*, every purchaser would also logically have to be deemed an aider and abettor to a felony, and would therefore be subject to a mandatory minimum sentence." *Id.* at 96. The dissenter was concerned that the result in *Lowman* meant that the punishment would be disproportionate to the crime, and that such was not intended by the legislature. *Id.* at 101.

In *Lowman,* we considered the legislative history of the District of Columbia Code and found that it disclosed that the Council did indeed draw distinctions among various categories of offenders. However, the Council most certainly did not do so in such a way that could provide relief for the appellant in *Lowman* or for Alfred Durham. The majority in *Lowman* stated:

> Unlike our dissenting colleague, *infra* at 98, we do not read the legislative history of the District of Columbia's statute to suggest more than that the Council of the District of Columbia was distinguishing between possession and distribution, between first and repeat offenders, and between dealers who sell to adults and those who sell to minors.... The concern our dissenting colleague addresses, namely the distinction between a person who aids a buyer and a person who aids the seller of illegal drugs, is not found in that history. The humanitarian and policy considerations favoring the dissent's approach are, in our view, more properly for the legislature, rather than the court, to weigh in deciding whether to amend existing law. We are unpersuaded at this point that the court's interpretation of aiding and abetting might result in a buyer of illegal drugs being guilty of the crime of distribution.

*Id.* at 92 (citation omitted).

We know that the Council of the District of Columbia consciously did include the concept of leniency in its statutory scheme to punish and combat drug distribution. However, it chose to do so only in the sentencing phase of the legal process, not through its definitions of the offenses.

The Council incorporated leniency through the establishment of the so-called "addict exception" to the mandatory-minimum sentences for the crime of distribution.[11] This was a valid legislative choice, but we have no authority to broaden it into areas not chosen by the Council.

On the whole, appellant asks this Court to recognize a defense that is precluded by the words of the statute and by pre-existing case law in our own jurisdiction. Like the majority in *Lowman,* we will not plunge into re-writing the Code because we do not sit as a legislature. We cannot waver from the principle of separation of powers. This principle would require us to deny Durham any relief, even if we were sympathetic to his arguments. His remedy on this issue lies solely in the Legislative Branch.

## III. THE *TOLIVER* ISSUE

■ The kind of issue raised by appellant as to *Toliver* evidence deserves only a brief analysis, because the facts herein are a textbook example of evidence that is admissible under *Toliver.* The trial court denied appellant's pretrial motion to exclude the early portions of Officer Moomau's testimony, *i.e.,* his description of appellant's very first approach to a man in a car. The trial judge correctly denied the motion to exclude such testimony. The following factors compel our conclusion.

■ In *Toliver, supra,* we held that the Government is entitled to present evidence of other, uncharged crimes "when relevant

---

11. We have observed that the "addict exception permits the trial judge to waive the mandatory-minimum sentence when sentencing a person who has no previous drug manufacturing or distribution convictions if that person was an addict at the time of the offense and the primary purpose of the offense was to enable that person to obtain narcotic drugs for his or her own personal use, D.C.Code § 33–541(c)(2)(1988)." *Dupree v. United States,* 583 A.2d 1000, 1001 n. 1 (D.C.1990).

to explain the immediate circumstances surrounding the offense charged." 468 A.2d at 960. Such testimony "is admissible '[to] complete the story of the crime on trial by proving its immediate context ....'" *Id.,* quoting McCormick on Evidence § 190 (2d ed.1972). The admission of so-called *Toliver* evidence is an exception to the rule that evidence of other crimes is inadmissible except for certain limited purposes, such as proof of motive or identity. *Id.; see Drew v. United States,* 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964).

The facts at hand closely track the type of evidence that was correctly admitted in *Toliver* itself. There, the appellant

> was arrested after being observed from a police narcotic observation post exchanging small white packets for money with six separate individuals. Soon thereafter, a police arrest team moved in, and as they approached, saw appellant throw a small white object to the ground. The object was retrieved and appellant was placed under arrest.

*Toliver,* 468 A.2d at 959.

In the instant case, the trial court ruled that the testimony of Moomau should be characterized as *Toliver* evidence. The trial judge concluded, "I am going to allow the government to bring that information out through the officers, because it pretty much explains why they were there and what their observations were."

Having readily sanctioned the admission of the pre-arrest observations in *Toliver,* there is certainly no basis for reversing the trial court's ruling herein.

The common law of this jurisdiction now abounds with affirmances in criminal appeals that are very similar to the instant case. We need not recapitulate all of those citations. It suffices to say that numerous convictions have been affirmed by this Court where the disputed *Toliver* evidence was at least as indicative of alleged or suspected criminal conduct, even

if it did not recite the underlying facts of such activity.

For example, in *Ford v. United States,* 396 A.2d 191 (D.C.1978), a drug conviction was affirmed where police testified that the appellant was the subject of an outstanding warrant at the time of his arrest. This testimony explained why the police first approached him, *i.e.,* to execute the warrant. *Id.* at 193.

In *Green v. United States,* 440 A.2d 1005 (D.C.1982), we affirmed a conviction for possession of marijuana where the police testified to observation of two different marijuana sales made by defendant prior to his arrest. The sales themselves were arguably more egregious than the offense for which appellant therein was actually arrested. Yet, we found that their probative value outweighed any prejudice to the defendant in "placing in context and making comprehensible to the jury the actions of the police in approaching, arresting, and searching appellant ...." *Id.* at 1007.

In *Toliver* itself, there were six pre-arrest exchanges, not just one ambiguous contact with a man in a car. *Toliver, supra,* 468 A.2d at 959.

Here, the first incident recounted by Moomau was temporally well connected to the acts that actually precipitated the arrest. All of his observations elapsed within a maximum window of 20 minutes. Consequently, we do not see herein a problem caused by an inordinate lapse of time between the arrest and the initial observations. *See, e.g., Parker v. United States,* 586 A.2d 720, 723–25 (D.C.1991) (evidence of seven-month-old prior acts of domestic violence held inadmissible because of lack of close temporal relationship); *Holmes v. United States,* 580 A.2d 1259, 1266–67 (D.C.1990) (prior robberies more than one month old deemed to be too old to be contemporaneous or intimately entangled with the crime charged).

In his brief, the appellant complains:

> There was no showing that the government needed such evidence to success-

fully prosecute its case, since the defense established by its own evidence that Durham had given the drugs to Thomas and had recovered $50.00 from him. That transaction was admitted by the defendant, but his explanation of the event was at variance with a finding of distribution, claiming that he was merely returning drugs given to him for his personal use. That the other crimes evidence was highly prejudicial to the defense, under the circumstances, is obvious.

Nothing was "obvious." We disagree that there was no need for the Government to seek to use the entire testimony of Officer Moomau.

The testimony of Officer Moomau was manifestly relevant for the purpose of explaining to the jury exactly how appellant came to the attention of the police and how Officer Moomau was personally in a position to see the specific acts that prompted the arrest. Probative value is not a minor matter. Because the Government bears the burden of proof beyond a reasonable doubt, the Government has the common sense obligation to bring forth basic evidence of how the crime was observed and by whom. It is unrealistic to expect the Government to truncate its case-in-chief by utilizing only bare bones testimony about an arrest team stopping a citizen merely because of the word from an officer far away. The arrest need not be tersely described for the jury as a non sequitur, an event that erupted out of the blue.

Because of its high burden of proof, the Government is entitled to present a thorough set of facts, to refine its case-in-chief to rationally anticipate a factual issue that may create a reasonable doubt in the minds of jurors. The use of *Toliver* evidence can serve this purpose, as it illuminates the practical context of the arrest itself. In drug cases, *Toliver* evidence (from the Government's standpoint) could ostensibly ward off the image of police officers stopping a citizen for no reason. This is an especially sensitive consideration where the officers who actually arrest the particular citizen are not the same officers who witnessed the crime itself.

We discount appellant's suggestion, as quoted above from his brief, that it was not "necessary" for the Government to present the first portion of Moomau's testimony. After all, the Government could not rely on the possibility that appellant would testify to a story that conveniently dovetailed into much of what Moomau had reported. Even where, as here, defense counsel proffers his client's testimony during the opening statement, the defense is not required to present any evidence at all. For this reason, a defendant or his lawyer can always have a change of strategy during the trial. There is always a risk that the defense will rest at the end of the Government's case-in-chief, leaving the Government unable to present a truly cohesive story to the jury.

The prejudice claim is weak, particularly in the hindsight of appellant's testimony. The jury was not left without an alternative explanation of what had occurred on the street. Once all of the testimony had been presented, the jury simply found that appellant's testimony was not sufficient to create a reasonable doubt.

It is common, if not typical, that the nature of *Toliver* evidence casts some type of suspicion upon the particular defendant. This alone, however, is not grounds for refusing to admit such evidence. A balancing must occur, and the trial judge herein made that balancing decision in favor of the fundamental and clear-cut probative value of the testimony in issue.

 "The determination of whether other crimes evidence is relevant and admissible to explain the surrounding circumstances of a crime, and whether its probative value outweighs its prejudicial effect, is committed to the discretion of the trial court." *Parker v. United States,* 586 A.2d at 724. Here, there was no abuse of discretion. Appellant received a fair hearing, and the facts support the trial court's

balancing of the interests of appellant and those of the appellee. Durham's complaint on appeal is completely lacking in merit.

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*

RUIZ, Associate Judge, dissenting in part:[1]

In this appeal we are confronted with a question we have not yet answered concerning the meaning of "distribution" in D.C.Code § 33–541(a)(1) (1998). I disagree with the majority's conclusion that the crime of drug distribution includes the conduct of a person who, having been given drugs, returns the drugs to the original transferor. That conclusion, although supportable by a literal application of the language of the statute, is nonsensical and leads to the absurd result that, if the transferee in this case had kept the cocaine handed to him, he would have been liable only for possession of cocaine, which is punishable as a misdemeanor by up to 180 days' incarceration and a fine of not more than $1,000, *see* D.C.Code § 33–541(d); but, because he tried to undo the transaction, by returning the drugs to the person who distributed the cocaine to him, he becomes liable for distribution of co-caine, which is a felony punishable by up to thirty years' incarceration and a fine of up to $500,000, *see* D.C.Code § 33–541(a)(2)(A). Nothing in our precedent compels this incongruous result, which is contrary to a reasonable interpretation of the statute consistent with legislative intent.

At the outset, it is important to recognize what is and is not at issue on appeal. At trial, appellant requested the trial court to instruct the jury that, "If you believe the defendant's theory of the case [that he was merely returning drugs which he rejected as payment by another of a debt owed to him], you must find him not guilty of Count I, Distribution of Cocaine." The trial court denied the request, not because there was not sufficient evidence to support the defendant's version of events,[2] but because the trial court concluded that there was no legal basis for the instruction. If the trial court's conclusion was wrong, we must reverse. As the Supreme Court has noted, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) (cita-

---

1. I join the opinion of the majority concerning the admissibility of what appeared to the police to be a drug transaction involving appellant just prior to the transaction that was the subject of the charge at issue in this appeal.

2. A trial court should instruct the jury on the defendant's theory of the case when that theory negates the defendant's guilt of the crime charged if the instruction is supported by " 'any evidence, however weak.' " *Graves v. United States*, 554 A.2d 1145, 1147 (D.C.1989) (quoting *Gray v. United States*, 549 A.2d 347, 349 (D.C.1988)). Given that it is the jury's responsibility to assess credibility, in this case there was sufficient evidence—no matter how questionable it may appear to us—of the alleged underlying factual scenario to support the requested instruction. Appellant, who was trained as an auto mechanic, testified that he had been a crack addict for ten years and that he did auto repair work on the side

to maintain his habit. He further testified that on the day of his arrest, he was washing his boss' car outside the restaurant where he was employed doing maintenance work. A Mr. Thomas approached him. According to appellant, Mr. Thomas owed him $50 for repairs he made to the car of Mr. Thomas' girlfriend. In payment of that debt, Mr. Thomas tendered three and a half rocks of crack cocaine in individual packets, told appellant to "check them out," and then went into a nearby barbershop for a haircut. After he finished washing the car, appellant went to the rear of the building to inspect the drugs, which he found to be of poor quality. After waiting some time for Mr. Thomas to exit from the barbershop, during which appellant spoke to a friend who drove up and went to the store to buy a lottery ticket for his boss, Mr. Thomas exited from the barbershop. Appellant told Mr. Thomas he did not want the crack. Mr. Thomas then gave him $50, and appellant returned the drugs to him.

tions omitted). Unless there is no factual or legal basis for the requested instruction, the trial court must instruct on the defendant's theory of the case. *See Doby v. United States,* 550 A.2d 919, 920 (D.C. 1988). Thus, we are faced with a pure issue of law .[3]

Appellant was charged with and convicted[4] of distribution of cocaine and possession with intent to distribute cocaine[5] pursuant to D.C.Code § 33–541(a)(1), which provides that "it is unlawful for any person knowingly or intentionally to manufacture, distribute, or possess, with intent to manufacture or distribute, a controlled substance." The statute defines "distribution" as the "actual, constructive, or attempted *transfer* from one person to another other than by administering or dispensing of a controlled substance, whether or not there is an agency relationship." D.C.Code § 33–501(9) (emphasis added). This court, in turn, has defined "transfer" in the familiar, dictionary sense of that word, as " 'to carry or take from one person or place to another.' " *Long v. United States,* 623 A.2d 1144, 1147 n. 6 (D.C.1993) (quoting PHILIP B. GOVE, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2426–27 (1986)).

As the majority correctly states, we have construed and applied literally the term "distribute" in a number of situations. *See Malloy v. United States,* 605 A.2d 59, 61 (D.C.1992) (per curiam) (holding that unlawful distribution had taken place where the appellant, who claimed that he was only the custodian of drugs owned by another, admitted to possessing

drugs as a "mule" for transportation to another city to be given to the dealer who had entrusted the drugs to him, because "a sale or exchange of money for drugs is not required under the statute"); *Wright v. United States,* 588 A.2d 260, 262 (D.C. 1991) (upholding an instruction that the defendant's admission that he intended to share drugs with a friend was evidence of an intent to distribute, concluding that "giving or sharing drugs with another constitutes distribution under the law, and an intention to share is evidence of intent to distribute"); *Chambers v. United States,* 564 A.2d 26, 31 (D.C.1989) (holding defendant's testimony that he bought cocaine with intention to share it with friends sufficient to prove intent to distribute).

In *Long, supra,* appellant was convicted of possession of heroin with the intent to distribute. *See* 623 A.2d at 1147. Appellant had testified at trial that he bought the heroin with money to which he and four companions had contributed to purchase and share the heroin for their use. The court held that Long's acknowledged plan to buy the drugs in order to then share the drugs with his friends was evidence of intent to distribute. In reaching that conclusion, we reviewed and adopted the reasoning in *United States v. Swiderski,* 548 F.2d 445 (2d Cir.1977), in which the court concluded that there was no intent to distribute in a situation where two defendants, a man and his fiancée, bought drugs together at the same time for personal use, only one received the

3. The jury appears to have been confused on the issue. After retiring to deliberate, the jury sent the following note: "We would like clarification of the term distribution and transfer."

4. Appellant was sentenced to not less than three, nor more than twelve, years on each count, to run concurrently—much more than he could have been sentenced had he been convicted of possession.

5. As appellant's requested instruction was directed exclusively to count 1, distribution of cocaine, this appeal does not challenge his conviction on count 2, possession of cocaine

with intent to distribute. Presumably, appellant considers that the jury could not have been instructed to acquit him of possession with intent to distribute even if the jury believed his story about returning the drugs, because as a matter of law his possession of several individually packaged bags of cocaine would permit a jury to infer intent to distribute sufficient to convict him of possession with intent to distribute, particularly in light of the officer's testimony that appellant had been observed earlier in what appeared to be a drug sale. *See Lawrence v. United States,* 603 A.2d 854, 858 (D.C.1992).

drugs from the seller, and immediately handed to his fiancée her share of the drugs, which both sampled on the spot. See id. at 1151.[6] We distinguished the situation in Long from that in Swiderski because in Long the appellant had purchased the drugs by himself—albeit with some of the money contributed by others—and then had given them to his friends. The facts in Long, in other words, were not meaningfully different from those in Wright and Chambers, supra, in which we had held that the intent to share drugs with others for personal use constitutes intent to distribute. Although we distinguished Swiderski on its facts, in Long we expressly "decline[d] the government's ... invitation to reject" the reasoning of the Court of the Second Circuit in Swiderski. See Long, supra, 623 A.2d at 1150–51.

Unlike the situation in Long, Wright and Chambers, here there is no transfer to a third party—the friends who were to share in personal use in those cases. The only two actors here are Thomas, the initial distributor, and appellant, the intended recipient of the drugs, who, after rejecting the drugs because of their poor quality, returned them to Thomas. To the extent that Long is instructive, it supports appellant's argument because, by approving the reasoning in Swiderski, in Long we recog-

nized that there is a difference, significant to the distribution statute, between a purchase of drugs that are subsequently transferred to other third party users (the case in Wright, Chambers and Long), and the facts in Swiderski, which involved a joint simultaneous purchase by two buyers acting as a unit, even though in Swiderski only one buyer received the drugs and actually transferred them to his co-purchaser.[7] In other words, in Long we approved the Swiderski court's refusal to apply a literal interpretation of the term "distribution" without regard to the underlying facts. Although the facts in Swiderski are not entirely on point,[8] its rationale is more applicable to this case than that of Wright, Chambers or Long because Swiderski, like this case, does not involve a subsequent transfer to a party outside of the parties engaged in the initial transfer of drugs. If the two joint purchasers in Swiderski were considered as one for the purpose of rejecting the notion that there was a distribution between them, a fortiori, the actions of a single transferee in sampling, and after rejecting the drugs, returning them to the distributor, cannot be compartmentalized into separate transactions.[9]

The start to interpreting a statute is, of course, the statutory language. " 'Absent

---

**6.** In Swiderski, as here, the recipients rejected the drugs as too poor in quality for their own use. Unlike in this case where appellant returned the drugs, one of the defendants in Swiderski indicated that they might keep the drugs to sell to others, who, presumably, would not be as insistent on quality.

**7.** The majority argues that Swiderski is not only distinguishable on its facts but unpersuasive because "post-Swiderski" opinions of this court (Wright, Chambers and Malloy) support a broad and literal interpretation of the term "distribution" that encompasses the return of drugs at issue in this case. See ante at 203. What the majority overlooks, however, is that in Long, we engaged in a more recent and pointed discussion on the subject. What is relevant for our purposes is not that the Second Circuit decided Swiderski in 1977, but that this court decided in 1993 to adopt Swiderski's reasoning, after our decisions in

Wright, Chambers and Malloy, upon which the majority relies.

**8.** As the court stated in Swiderski, "[o]ur holding here is limited to the passing of a drug between joint possessors who simultaneously acquired possession at the outset for their own use." 548 F.2d at 450–51.

**9.** This case is also unlike Malloy, where appellant was convicted of aiding and abetting distribution after he gave the drugs back to the dealer for whom he had acted as a "mule" by transporting drugs worth over $20,000 on the street from Baltimore to Washington, D.C. The trial judge in that case found that appellant's actions had "aided and abetted the dealer's scheme to distribute drugs, noting that use of a courier insulated the dealer from the risk of arrest while transporting the drugs". 605 A.2d at 60.

a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *In re G.G.*, 667 A.2d 1331, 1333 (D.C.1995) (quoting *West End Tenants Ass'n v. George Washington Univ.*, 640 A.2d 718, 726 (D.C.1994)). Even where the words of a statute are unambiguous, however, we do not give effect to a plain language interpretation which is "'plainly at variance with the policy of the legislation as a whole.'" *Id.* (quoting *Tenants Ass'n, supra*, 640 A.2d at 726 n. 14) The court must determine the meaning of the language "'in accordance with the legislative intent and common understanding to prevent absurdities and to advance justice.'" *Id.* (quoting 1A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 20.08 (5th ed.1993)). This approach is required by the doctrine of separation of powers, which cabins our judicial function to give effect to the legislature's intent. *See District of Columbia Nat'l Bank v. District of Columbia*, 121 U.S.App.D.C. 196, 198, 348 F.2d 808, 810 (1965).

There is no dispute that the legislature intended to treat those who deal in drugs for their own personal use differently from those who deal in drugs as entrepreneurs, *i.e.*, for the purpose of passing it on to others, most usually for profit. We have characterized the difference as whether the conduct is a link in the chain of distribution—rather than an endpoint—in the drug trade. *See Long, supra*, 623 A.2d at 1149. This legislative intent is evident from distinctions in the statute drawn between possession and distribution, and the widely different penalties that can be imposed upon people involved in the drug trade, depending on whether they are convicted of possession, a misdemeanor, or found guilty of distribution or possession with intent to distribute, which are felonies. Such a disparity in sanction reveals that the legislature considered that "distribution" is different in nature from, and much more serious than, mere "possession" of drugs. As we stated in *Long*, the purpose of the statute was to "introduce a system in which the penalty for prohibited conduct is graded according to the *nature of the offense* and the schedule of the substance involved." 623 A.2d at 1150 n. 13 (quoting COUNCIL OF THE DISTRICT OF COLUMBIA, REPORT OF THE COMMITTEE ON THE JUDICIARY ON BILL 4-123, THE "DISTRICT OF COLUMBIA UNIFORM CONTROLLED SUBSTANCES ACT OF 1981," 5) (April 8, 1981) (emphasis added). It is therefore important to elucidate the reasons underlying the distinctions created by the legislature to determine whether the conduct in this case is of the nature of the crime of possession or that of distribution, as the legislature conceived them. In conducting this inquiry we must bear in mind that the legislature considered that there are significant differences between the two and that distribution, which carries a much stiffer penalty, is a more serious crime. Thus, to the extent that the statutory language can be read so that the conduct at issue in this case could come within either the crime of possession or that of distribution, it is also part of our judicial role, in effectuating the legislature's intent, to apply the rule of lenity and include the conduct within the less serious offense of possession so as not to create penalties not contemplated by the legislature. *See Riggs Nat'l Bank v. District of Columbia*, 581 A.2d 1229, 1262 (D.C.1990).[10]

Because there are only two actors in this transaction, the government is unable to

---

10. In this regard, the majority incorrectly concludes that the legislature included the concept of leniency in the statute but "chose to do so only in the sentencing phase of the legal process ... through the establishment of the so-called 'addict exception' to the mandatory-minimum sentences for the crime of distribution." *Ante* at 205. That the legislature sought to recognize the special case of addicts who are involved in drug distribution to support their habit—cases in which there is no doubt that the addicts are selling drugs—and mitigate the sanction even though they engage in drug distribution, does not answer whether there was any "distribution" within the meaning of the statute on the facts before us. *See Swiderski, supra*, 548 F.2d at 451 n. 3.

argue, as it did in *Lowman v. United States,* 632 A.2d 88 (D.C.1993), that appellant acted as an aider or abettor of the seller or somehow acted as an agent for a distributor in approaching a buyer.[11] *See* 632 A.2d at 89. Nor can appellant be described as an inherent part of the seller's drug operation as in *Malloy,* where the drugs were transported from one location to another for the benefit of the seller. See *supra* note 9. The appellant in this case simply cannot be said to have been acting for either a third-party seller or buyer; rather he was acting for himself, a principal on the receiving end of the transaction. As in *Lowman,* however, the government makes the argument, which the majority finds persuasive, that appellant's handing back the drugs constitutes distribution because it "facilitated" the seller's future distribution of cocaine. According to the government, by rejecting the cocaine tendered to him, and handing the drugs back to Thomas, appellant ensured that the drugs would remain available in the stream of commerce for distribution to others. Presumably, the government believes that if this description of the effect of the appellant's actions is accurate, it would be sufficient to be deemed "distribution" under the statute.

The government's theory is flawed on both counts, however, because it is neither accurate nor sufficient under the statute. First, the underlying thesis that someone who refuses to accept drugs encourages the drug trade by making it necessary to recruit others, may, as an economic matter, be logical, but it is invalid in the context of a criminal offense. Drug distributors obviously need consumers (those who possess drugs for personal use), but the dealer's need for customers does not convert consumers into "links" in the drug trade within the meaning of the distribution statute. They are end users, who, as in this case, sometimes accept drugs "on approval." *See Long, supra,* 623 A.2d at

1149 ("'Purchasers who ... acquire drugs ... for their own purpose ... do not perform any service as links in the chain; they are ultimate users.'") (quoting *Swiderski, supra,* 548 F.2d at 451). Second, even if there were some theoretical basis for the government's argument, it is insufficient to satisfy the legislature's clear design that there is a significant line between those who distribute drugs and those who possess them. Under the government's all-encompassing theory of "distribution by facilitation," even a passerby who rejects drugs offered casually on the street facilitates the drug trade by refusing to buy drugs, ensuring that the rejected seller will have to move on to another hoped-for customer. *Cf. Lowman, supra,* 632 A.2d at 96 (SCHWELB, J., dissenting) (noting that under the government's theory of facilitation, "[e]very purchaser of drugs makes it easier, by his or her conduct, for a seller to sell.") This reed is much too slim to support the conclusion that a person who is and acts as a consumer, is transformed into a distributor by literal application of the word "transfer." For these reasons, I respectfully dissent and would reverse Durham's conviction for distribution.

---

**11.** The government does not argue, and the record on appeal does not reflect, that an aiding and abetting instruction was given to the jury in this case.