Roderick LONG, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–1130.

District of Columbia Court of Appeals.

Argued Oct. 28, 1992.

Decided Jan. 29, 1993.

Gary L. Segal, Rockville, MD, appointed by the court, for appellant.

Kathleen S. Davies, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., Roy W. McLeese, III, and Peter V. Taylor, Asst. U.S. Attys., Washington, DC, were on the briefs, for appellee.

Before SCHWELB, FARRELL, and SULLIVAN, Associate Judges.

SCHWELB, Associate Judge:

Roderick Long was convicted by a jury of possession of heroin with the intent to distribute it (PWID). D.C. Code § 33–541(a)(1) (1988). The trial judge also found him guilty of unlawful possession of drug paraphernalia, in violation of D.C. Code § 33–603(a) (1988).[1]

Long testified at trial that he purchased the heroin in question with money contributed by him and by four companions for the purpose of sharing it with those companions. On appeal, he contends that the trial judge, by his instructions and by his rulings relating to the parties' proposed closing arguments, erroneously barred Long from asserting as a defense that his conduct fell outside the statutory meaning of unlawful "distribut[ion]." We affirm.

I.

On November 28, 1990, at about 11:30 a.m., police officers, armed with a search warrant and its ominous companion, the battering ram, knocked on the door of Long's apartment and announced their presence. The officers received no response, but heard footsteps suggesting that people were running from the entrance to the apartment. Some ten seconds after having knocked and announced, the officers effected a forcible entry by breaking down the door with the ram.

There were five men in the apartment, one of whom was its tenant, Roderick Long. Long, who was in the kitchen, threw something in the direction of the stove. The police promptly recovered from a pot of hot grease which was on the stove a bundle of plastic ziploc bags wrapped together with a rubber band. These bags contained a white powder which later proved to be heroin. Ten more packets of heroin were found in a bedroom, and police also recovered a number of syringes, home-

---

1. The trial judge granted Long's motion for severance as to several charges, and Long was acquitted with respect to a number of other counts.

made pipes, and other narcotic paraphernalia,[2] as well as a shotgun.

Long, who was born in 1947, testified at trial that he had a heroin habit and that he had been using unlawful drugs for twenty-six years. He admitted that he had been in possession of the ten packets of heroin and that he had attempted to discard them by throwing them into the pot of hot grease. He denied, however, that the heroin was for sale. Rather, he maintained that each of the other four men at the apartment, one of whom was living with him, had given him money, and that a short time before the police arrived, he and one of the men had gone out to purchase heroin for the group.

The principal legal issue in the case arose during a discussion of jury instructions and of points which counsel proposed to raise during closing argument. Noting that Long had testified that he intended to pass the heroin around to his friends, the prosecutor maintained that Long had in effect admitted his intent to distribute. The prosecutor asked for permission to make this argument to the jury. Through his counsel, Long contended that such an argument should not be permitted because it was contrary to law:

> If two people go out and buy a rock of cocaine ... but only the first person carries it down the street, and then when they get to their apartment, they both smoke it, that first person is not guilty of distribution. At least, I don't think that's what the legislature intended, for

that first person to be guilty of distribution, because he's the one who carried it from the point of purchase to the point of use and then more than one person used it.

> Otherwise, all users would be guilty of distribution, because I think the Court can take judicial notice of the fact that drug users share their drugs, and sharing of drugs is not the same as transferring in the language that the legislature intended.

The judge, who gave the issue thoughtful and conscientious consideration, initially agreed with Long's submission:

> If two people go out, put money together to buy a substance, with the understanding that they will share it among themselves, they are both buying, they are both purchasing. Technically, they're also aiding and abetting the distribution, but I just don't see that as the type of transfer that is sanctioned, that the legislature intended to sanction.

> \*     \*     \*     \*     \*     \*

> [I]t just does not seem to me likely that the statute is intended to sanction, as a thirty-year felony with a mandatory minimum sentence, actions of two users who share a commonly-owned store of drugs.

The judge indicated that he planned to instruct the jury in accordance with this view.[3]

---

**2.** Aside from the quantity of the heroin and its apparent packaging for sale, the police recovered significant evidence suggesting that the apartment was used as a distribution center. Specifically the officers found a piece of paper with references to "billies," (which are small packets of heroin packaged for street distribution) and to missing money related to the "billies."

**3.** The judge stated:

I don't pretend to know definitively the answer, but if this was Mr. Long's heroin, Mr. Long ... believed it was his and he intended to share it with other people in the apartment, I think that that would be a prohibited distribution of heroin. On the other hand, if it was heroin that he believed was jointly owned by himself and other people, and he intended only to share it with the other owners, then I

don't think that's the type of transaction that the legislature intended to be a felony.

That's my belief, and until I see some authority one way or the other contrary to that, then that's the position I take as far as this trial is concerned. I doubt that there's any clear authority one way or the other, but that is, in my view, a common-sense type of resolution of the issue. So, arguments must be consistent with that.

It may be that I should instruct in that regard, if you intend to argue that way ... [i]f Mr. Long reasonably believed that the people who would share the heroin were persons who were part owners of it, then that would not constitute an unlawful distribution. On the other hand, if he intended to share it, give it, sell it to people who he did not have reason to believe had any proprietary interest in it, then that would be an illegal transfer.

The prosecutor, however, requested that argument and jury instructions be deferred until the next day so that he could find authority on the point. The following morning, the judge, while understandably remaining troubled, felt constrained to reverse his earlier tentative judgment:

> As to the matter we were discussing yesterday, frankly, on reflection, I'm not sure that it's appropriate for me, based on what I perhaps think the legislature should admit, to limit the Government's argument. This statute is more stringent than the Harrison Narcotics Act. I believe it's clear that the old purchasing agent defense [4] that used to be available is not available under this statute.
>
> Previously, if one were believed to have been acting only as an agent of the buyer, a conduit so to speak, then that was a defense, but it's not under this statute. This statute prohibits transfer. "Distribute" means the actual, constructive or attempted transfer from one person to another, other than by administering or dispensing, of a controlled substance whether or not there's an agency relationship.
>
> So, that language was, I believe, specifically intended to eliminate the purchasing agent defense. Transfer has to be other than by administering. "Dispense" means to distribute a controlled substance pursuant to lawful order. So, that's not an issue and administering isn't an issue.
>
> So, I'm hard put.... I'm inclined to believe that there is no basis for me to find that ... the legislature did not intend to prohibit the type of transfer that your client has apparently acknowledged was his purpose. Two or more people go and purchase drugs in a joint activity or joint venture, one of them brings the drugs home, he hands part of them to the other person. I—contrary to what I indicated yesterday, I don't think that I

can say that that is not the type of transfer prohibited by the statute.

> It's somewhat troubling to me that one who engages in that activity would thereby be subject to a mandatory minimum sentence, but I can't limit a party from arguing because the possible result would be troubling to me.

In conformity with this ruling, the judge permitted the prosecutor to argue that, by testifying that he intended to share the heroin with his purported co-purchasers, Long had effectively acknowledged his intent to distribute heroin to them. Long's counsel inquired whether he could argue, in response, that the ten-pack "was owned jointly by the group for personal use." The judge responded that "you can argue that if you wish, but if they come back and ask whether it's an illegal distribution or transfer to transfer to someone whom you consider to be a joint possessor, I would have to tell them that it would still be an illegal transfer." [5]

In light of the judge's ruling, the prosecutor noted during the course of his argument that Long had testified that he had panicked and thrown the heroin into the grease, "but that his intent was to distribute the drugs to the other people in the apartment." He invited the jurors to listen carefully to the judge's instruction that a transfer is "simply giving the drugs out, whether for money or not, to other people." Long's attorney responded that

> [t]here were five junkies in the apartment when the police came in. Each one of them uses several packs of heroin a day. The amount of heroin in that apartment was a day or two supply, at most, for the people who were there, not a sufficient amount to show that they intended to sell it, a sufficient amount to show that they intended to use it.

In his initial charge to the jury, the judge stated that to establish the third (intent) element of PWID,

4. See discussion at page 1149, note 10, *infra.*

5. We question whether counsel may ever be authorized to make a legal argument contrary to the judge's view of the law. *See, e.g., Thomas*

*v. United States,* 557 A.2d 1296, 1304 (D.C.1989) ("[w]hen counsel misstates the law, the better practice is for the court to intervene promptly and to correct the misstatement...").

the government must prove beyond a reasonable doubt that the defendant possessed the controlled substance with the specific intent to distribute the controlled substance. The term "distribute" means the actual, constructive or attempted transfer of a controlled substance.

Late in the afternoon of the first day of deliberations, the jurors sent a note to the judge in which they inquired as to the elements of PWID and "specifically, what constitutes distribution and does it require an intent to distribute in exchange for money?" The judge responded the following morning by re-reading his original instruction and adding that

[i]t is not necessary for the government to prove that the defendant intended to receive money or property in return for a transfer of a controlled substance.

Long was convicted, *inter alia,* of PWID. This appeal followed.

## II.

In determining whether Long's acknowledged plan to share the drugs with his companions necessarily reflected an intent to distribute heroin, as the prosecutor was permitted to argue and as the judge at least implied in his instructions, we must first consider the language of the statute. It is unlawful in the District of Columbia to possess a controlled substance with intent to distribute it. D.C.Code § 33–541(a)(1) (1988). As used in our Controlled Substances Act,

"Distribute" means the actual, constructive, or attempted transfer from 1 person to another other than by administering or dispensing of a controlled substance, whether or not there is an agency relationship.

D.C.Code § 33–501(9) (1988). Transfer is not defined in the statute, but the word is evidently used in the familiar dictionary sense: "to carry or take from one person or place to another." [6] This, according to his own testimony, is precisely what Long intended to do; having bought the drugs on the street, he carried them to another place

(his apartment) and he intended, until the preemptive strike by the officers thwarted his plan, to give much of the contraband to his companions.

In a series of decisions during the past few years, this court has construed the term "distribute" literally. In *Malloy v. United States,* 605 A.2d 59, 61 (D.C.1992) (per curiam), we summarized the law as follows:

A sale or an exchange of money for drugs is not required under the statute. *See Wright v. United States,* 588 A.2d 260, 262 (D.C.1991) ("giving or sharing of drugs with another constitutes distribution under the law, and an intention to [give or] share is evidence of an intent to distribute"); *Chambers v. United States,* 564 A.2d 26, 31 & n. 10 (D.C.1989). Nor does the statute distinguish among types of transfers between parties, *i.e.* sales to third persons or, as in this case, deliveries between a dealer and a courier. *Cf. United States v. Workopich,* 479 F.2d 1142, 1147 (5th Cir.1973) (under parallel federal statute, 21 U.S.C. § 802(11), sale not required and agency relationship not relevant to issue of distribution). Appellant's act of delivery [to the individual who entrusted him with the drugs] is a separate act of distribution under D.C.Code § 33–501(9).

*See also Shabazz v. United States,* 606 A.2d 191, 193 (D.C.1992); *United States v. Ramirez,* 608 F.2d 1261, 1264 (9th Cir. 1979).

Long does not challenge the reasoning of *Malloy, Wright* or *Chambers,* nor does he ask us to overrule any of these cases. He seeks, however, to distinguish them on the ground that "in the previously decided cases the companion never had any proprietary interest in the drugs, exercising no dominion or control over them." Long maintains that since his companions had, according to his account, "chipped in money in advance for the drugs," they were joint possessors from the moment he purchased the heroin, and therefore had a right from that time forward "to their fair share of the whole."

---

**6.** Philip B. Gove, Webster's Third New International Dictionary 2426–27 (1986).

This argument might prevail if Long had purchased rare books, rice, or roses, but it is not persuasive in a case in which the purpose of the purported joint venture was to acquire and share heroin. As the trial judge remarked when the supposed proprietary interest of Long's companions was raised below, "I'm not sure that's really the best term to use when we're speaking of contraband. I wonder what type of real proprietary interest one can have in contraband."

In *State v. Toppan*, 425 A.2d 1336 (Me. 1981), the defendant grew marijuana in his garden. Two of his friends contributed money, seeds, and labor. Each friend was to receive a share of the marijuana after it was harvested. Toppan claimed that the entire venture was a joint enterprise, that the marijuana was shared solely with his two co-entrepreneurs, and that no "furnishing" had occurred because all of the participants were "joint possessors" of the drug from the outset. *Id.* at 1338.

In upholding Toppan's conviction for furnishing [7] marijuana, the court emphatically rejected his "joint possession" theory. Noting that the "sharing agreement" violated Maine law, the court said:

> Since the agreement was illegal, it created no rights of ownership or possession in the parties to it. [Citations omitted.] Toppan and his friends acquired from the agreement no legally enforceable rights with respect to the crop. Toppan stated at trial that it was his intention that when the marijuana was harvested his friends were to receive, or keep, a part of the harvest. Before the crop was harvested, however, Toppan had practical control over the marijuana by virtue of his joint ownership and possession of the farm with his wife. *At the moment he and his friends actually divided some of the harvested crop and each took possession of his individual share,*

> *there was a transfer of factual control amounting to a direct 'furnishing'....*

*Id.* at 1339 (emphasis added).

We agree with the foregoing analysis. Like Toppan, Long claimed that he was going to share unlawful contraband with his companions. As in *Toppan,* he had "practical control" of the heroin. The moment Long divided the ten-pack among the group of five, as he testified he intended to do, a "transfer of factual control" would take place. Long admitted that he was planning just such a transfer. That is PWID.

### III.

In advance of oral argument, this court directed the attention of counsel to *United States v. Swiderski*, 548 F.2d 445 (2d Cir. 1977). At the conclusion of argument, we invited the parties to file supplemental memoranda addressing the applicability of *Swiderski* to the present case, as well as any legislative history or other authority which might aid the court in the disposition of this appeal. We now consider the issues raised in these supplemental submissions.

In *Swiderski*, the named defendant and his then fiancee, Maritza De Los Santos, jointly and simultaneously purchased a substantial quantity of cocaine for $1,250. A short time later, they were arrested by officers of the Drug Enforcement Agency who had been conducting surveillance. Ms. De Los Santos had the cocaine and $3,100 in her purse; Swiderski had an additional $529 in his possession. 548 F.2d at 448. Although there was evidence that the defendants intended to distribute at least some of the cocaine to third parties,[8] the defendants denied such an intent, and contended in effect that they had been set up and that someone had slipped cocaine into Ms. De Los Santos' handbag.

---

7. "Furnish" is defined in the Maine statute, in pertinent part, as follows:

> To furnish, give, dispense, administer, prescribe, deliver, or otherwise transfer to another....

*Toppan, supra,* 425 A.2d at 1338 (statutory citation omitted).

8. Aside from the amount of contraband at issue and the defendants' possession of large sums of cash, there was testimony that Ms. De Los Santos had stated that the cocaine was not good enough for the defendants' personal use but that they had a buyer for it. *Swiderski, supra,* 548 F.2d at 448.

In his closing argument, the prosecutor argued that even if the defendants had purchased the cocaine merely with the intent to share it or "snort" it together, this would be sufficient to establish their intent to distribute. Over defense counsel's objection, the trial judge twice instructed the jury that giving or passing cocaine to a "friend" or "fianceé" constitutes "distribution." *Id.* at 448–49.[9]

The court, in an opinion by Judge Mansfield, unanimously reversed the defendants' PWID convictions and remanded for resentencing on the lesser included offense of unlawful possession. The court concluded that the federal Comprehensive Drug Abuse Prevention and Control Act, viewed "as a whole," draws a sharp distinction between drug offenses of a commercial nature and illicit personal use of controlled substances. *Id.* at 449–50. According to the court, Congress provided for more severe penalties for trafficking and distribution because "such conduct tends to have the dangerous, unwanted effect of drawing additional participants into the web of drug abuse." *Id.* at 450.

It was the court's view, on the other hand, that "where two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, their only crime is personal drug abuse ..." *Id.* "Since both acquire possession from the outset and neither intends to distribute the drug to a third person, neither serves as a link in the chain of distribution." *Id.* Thus, the court concluded, "the mere existence of joint possession by two closely related persons— here an engaged couple who later married one another—is alone not enough to provide the basis for such an inference [of intent to distribute]." *Id.*

Emphasizing that Congress sought "to distinguish between one who acts as a link in the chain of distribution and one who has already acquired possession of his own use," 548 F.2d at 451, the court rejected the government's argument that the abolition of the so-called "buyer's agent" defense [10] demonstrated that Congress also intended to punish (as PWID) the sharing of drugs between two persons who simultaneously acquire joint possession of the drugs. *Id.* In the court's view,

> [t]he agent who delivers to his principal performs a service in increasing the distribution of narcotics. Without the agent's services the principal might never come into possession of the drug. Purchasers who simultaneously acquire drugs jointly for their own purpose, however, do not perform any service as links in the chain; they are the ultimate users.

*Id.* Accordingly, the court held that the trial judge's instructions were erroneous, reversed the defendants' PWID convictions, and remanded for resentencing.

The court's general approach in *Swiderski* has been followed by the Supreme Courts of California, *People v. Edwards*, 39 Cal.3d 107, 216 Cal.Rptr. 397, 702 P.2d 555 (1985),[11] and of Minnesota, *State v.*

---

9. The trial court's second instruction to this effect was given in response to a note from the jury specifically requesting "[c]larification of the following: If both defendants possess the drug (*i.e.*, one paid for it and it was found in the other's handbag) can 'intent to distribute' mean giving the drug to the other or must third parties be involved?" *Swiderski, supra,* 548 F.2d at 449.

10. Prior to 1970, one who acted as a procuring agent of the purchaser was not viewed under federal law as having engaged in the sale of unlawful drugs. *See, e.g. Lewis v. United States,* 119 U.S.App.D.C. 145, 148, 337 F.2d 541, 544 (1964) (Burger, J.), *cert. denied,* 381 U.S. 920, 85 S.Ct. 1542, 14 L.Ed.2d 440 (1965). In the 1970 legislation, Congress proscribed transfers of controlled substances "whether or not there exists an agency relationship," thereby effectively

eliminating the "purchasing agent" defense. *See United States v. Porter,* 764 F.2d 1, 11–12 (1st Cir.1985); *United States v. Marquez,* 511 F.2d 62, 64 (10th Cir.1975). The District of Columbia definition of distribution, as we have seen, likewise applies "whether or not there exists an agency relationship." D.C.Code § 33–501(9) (1988), quoted at page 8, *supra. Cf. State v. Bressette,* 136 Vt. 315, 388 A.2d 395, 397–98 (1978) (one who acts solely on behalf of the buyer may not be convicted of sale of unlawful drugs).

11. *Edwards* was a felony murder case predicated on distribution of heroin. The court concluded, without mentioning *Swiderski,* that a distinction, previously drawn in *People v. Mayfield,* 225 Cal.App.2d 263, 267, 37 Cal.Rptr. 340, 342 (1964), between one who sells or furnishes

*Carithers,* 490 N.W.2d 620 (Minn.1992).[12] Moreover, the fundamental message of *Swiderski*—that the legislature did not intend to treat with equal severity on the one hand, entrepreneurs who profit from distribution of heroin or crack, and on the other hand, addicts who pool their resources to purchase drugs for their own joint use— finds meaningful support in the legislative history of the District's Uniform Controlled Substances Act[13] and of its federal counterpart.[14] We therefore decline the govern-

heroin and one who simply participates in a group purchase, is a valid one "at least where the individuals involved are truly 'equal partners' in the purchase and the purchase is made strictly for each individual's personal use." *Edwards,* 39 Cal.3d at 113, 216 Cal.Rptr. at 401, 702 P.2d at 559. The court added the following significant qualification:

> We expect there will be few cases involving a copurchase by truly equal partners. Where one of the copurchasers takes a more active role in instigating, financing, arranging or carrying-out the drug transaction, the "partnership" is not an equal one and the more active "partner" may be guilty of furnishing to the less active one. Furthermore, one who acts as a go-between or agent of either the buyer or seller clearly may be found guilty of furnishing as an aider and abettor to the seller. (Citations omitted). However, because one who merely purchases drugs is not guilty of furnishing as an aider and abettor of the seller (*People v. Label* (1974) 43 Cal.App.3d 766, 770, 119 Cal.Rptr. 522), an equal partner in a copurchase cannot be found guilty of furnishing to his copurchaser on a theory that he aided and abetted the actual seller.

*Id.* at 113 n. 5, 216 Cal.Rptr. at 401 n. 5, 702 P.2d at 559 n. 5.

**12.** The court said:

> In a typical prosecution under [the drug-related felony murder statute], on facts similar to those in this case, the state may be able to obtain a conviction by proving that the heroin was not jointly acquired, that is, that the defendant acquired the heroin individually, then "sold" it to the deceased. But in the instant case we must assume, given the phrasing of the certified question and the apparently undisputed facts, that each of the defendants acquired the heroin jointly with his or her spouse. Under the reasoning of *Swiderski,* neither defendant can be convicted of the predicate felony of furnishing or transferring or delivering heroin to a spouse who already has constructive possession and therefore cannot be convicted of felony murder under [the statute].

*Carithers, supra,* 490 N.W.2d at 623.

**13.** The District of Columbia Uniform Controlled Substances Act was enacted, in part, in order to punish offenders according to the seriousness of their conduct. COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 4–123, THE UNIFORM CONTROLLED SUBSTANCES ACT OF 1981, 2– 3 (April 8, 1981) (COMMITTEE REPORT). The Judiciary Committee stated:

> While there is dispute over what penalties should be imposed, the proposition that the criminal consequences of prohibited conduct should be tied to the nature of the offense committed is unassailable. Title IV of the CSA would abolish the unilateral approach of the UNA and would introduce a system in which the penalty for prohibited conduct is graded according to the nature of the offense and the schedule of the substance involved.

COMMITTEE REPORT, at 5. Indeed, in a memorandum ridiculing the notion that a purchaser of prescription medicine who subsequently passed it on to an ill friend would be subject to proposed mandatory minimum sentencing, the Councilmember who sponsored such enhanced sentencing stated that the mandatory sentence could not be imposed even with respect to heroin "if the person merely possessed the drug or narcotic and passed it on." MEMORANDUM OF COUNCILMEMBER JOHN RAY TO MEMBERS OF THE COUNCIL REGARDING BILL 4–123, May 18, 1981). Although it is questionable whether this cryptic comment was intended to have consequences quite as exculpatory as its words imply—in general, transferring heroin to another appears to fall well within the unambiguous definition of distribution—the general tenor both of the COMMITTEE REPORT, and of the sponsoring Councilmember's memorandum is quite compatible with the approach of the court in *Swiderski. But cf. Chambers, supra,* 564 A.2d at 31 & n. 10.

**14.** As the court noted in *Swiderski, supra,* 548 F.2d at 449–50, "Congress followed the philosophy of the President's Advisory Committee on Narcotic and Drug Abuse; ('the Prettyman Commission') ..., which proposed stringent measures against the evils of drug traffic and rehabilitation rather than retribution in the case of personal drug abuse." The Prettyman Commission's own statement of its philosophy is revealing:

> The general philosophy of this Commission can be stated in three parts:
> (1) The illegal traffic in drugs should be attacked with the full power of the Federal Government. The price for participation in this traffic should be prohibitive. It should be made too dangerous to be attractive.
> (2) The individual abuser should be rehabilitated. Every possible effort should be exerted by all governments—Federal, State, and local—and by every community toward this end. Where necessary to protect society, this may have to be done at times against the

ment's belated invitation to reject *Swiderski* as incorrectly decided.[15]

We agree with the government, however, that *Swiderski* does not control this case. *Swiderski* and his fiancee purchased the drugs jointly and simultaneously. Long, on the other hand, brought heroin home to his friends and, according to his own account, was about to pass several packets on to them when his plans were interrupted by a police battering ram. Unlike Swiderski, Long had already begun to serve, and was intending to continue to serve, "as a link in the chain of distribution." *See Swiderski, supra,* 548 F.2d at 450. Unlike the appellants in *Edwards,* see note 11, *supra,* Long was more than an "equal partner" with his companions, for he took a far more active role than they did in the drug transaction; indeed, he acted as a go-between for the other addicts and the seller in order to provide the addicts with their drugs.

In *United States v. Wright,* 593 F.2d 105 (9th Cir.1979), the defendant claimed that a woman had given him money to purchase heroin. He did so, and the two of them subsequently snorted together. Relying on *Swiderski,* Wright requested a jury instruction to the effect that this scenario did not constitute distribution on his part. The court affirmed the trial judge's refusal so to instruct, because

> [t]he evidence in this case does not support a *Swiderski* charge. This is not a case in which two individuals proceeded together to a place where they simultaneously purchased a controlled substance for their personal use. Here Wright operated as the link between the person with whom he intended to share the heroin and the drug itself. He was not entitled to the instruction he sought.

*Wright, supra,* 593 F.2d at 108 (citation omitted).[16]

*Wright* is essentially this case. Indeed, Long acknowledged that he intended to distribute heroin to several persons who were not present when it was purchased. The trial judge correctly held that this acknowledgment amounted to an admission of PWID, and his rulings based on that holding were correct. Long's convictions must therefore be, and each is hereby

*Affirmed.*

---

abuser's will. Pertinent to all, the causes of drug abuse must be found and eradicated.

(3) Drug users who violate the law by small purchases or sales should be made to recognize what society demands of them. In these instances, penalties should be applied according to the principles of our present code of justice. When the penalties involve imprisonment, however, the rehabilitation of the individual, rather than retributive punishment, should be the major objective.

*See* 1970 U.S.Code Cong. & Adm.News 4575. The Commission also stated that "if the abuser is to be penalized, he should not to be penalized in the spirit of retribution ... Penalties should be designed to permit the offender's rehabilitation wherever possible." *Id.* Obviously, the Commission knew that addicts share drugs, and did not contemplate that two addicts who did so should receive the same sort of punishment—at present, mandatory minimum penalties—as are justifiably meted out to active participants in illegal drug traffic.

**15.** At oral argument, counsel for the government explicitly and repeatedly declined to argue that the decision in *Swiderski* was wrong. In its post-argument brief, however, the government has embraced the very contention which it had previously disavowed.

**16.** Finding *Swiderski* distinguishable, the court thought it unnecessary to address the question whether that case was correctly decided. *Wright, supra,* 593 F.2d at 108. *See also State in the Interest of A.J.,* 232 N.J.Super. 274, 286–87, 556 A.2d 1283, 1290–91 (1989) and *State v. Roach,* 222 N.J.Super. 122, 126–28, 536 A.2d 282, 284–85 (1987), *certif. denied,* 110 N.J. 317, 540 A.2d 1293 (1988), cases in which a New Jersey intermediate appellate court has taken an extremely expansive approach to the meaning of distribution. These cases, decided under New Jersey law, may be difficult to reconcile with *Swiderski* and with the federal and District of Columbia legislative history discussed in this opinion.