

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FIVE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101640 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Charles County |
| vs. | ) | |
| | ) | Honorable Nancy L. Schneider |
| JASON R. SHELL | ) | |
| | ) | |
| Appellant. | ) | Filed: May 31, 2016 |

### Introduction

Jason Shell (Defendant) appeals the judgment of the Circuit Court of St. Charles County, entered after a jury trial, convicting him of one count of distribution of a controlled substance and one count of involuntary manslaughter. On appeal, Defendant argues that: 1) there was insufficient evidence to convict him of distribution of a controlled substance; 2) there was insufficient evidence to convict him of involuntary manslaughter; 3) the trial court erred by not declaring a mistrial, *sua sponte*, during the State's closing argument; 4) the trial court erred by denying his motion to suppress his statements made to the police; and 5) the trial court erred by denying his motion for a trial continuance.

Concluding that the State failed to present sufficient evidence to support Defendant's conviction of Count II—involuntary manslaughter—we reverse Defendant's conviction on that count. We affirm Defendant's conviction of Count I—distribution of a controlled substance.

**Factual Background**

In January 2012, Defendant and James Eyman (Decedent) were planning to buy heroin. In text messages, Decedent told Defendant that he had $40 to put toward the purchase. Combined with Defendant's $30, the men were able to purchase seven doses of heroin. Defendant contacted his heroin dealer and purchased all $70 worth of heroin, to be paid back by Decedent when they met up later in the evening.

After buying the heroin, Defendant went to Decedent's parents' house—where Decedent was living at the time—and picked up Decedent. The men went to Defendant's house, where they each injected themselves with heroin. Defendant took three doses, while Decedent took four. Defendant drove Decedent back to his parents' house around 11:00 p.m. Decedent went inside, told his mother that he was tired and going to bed, and went into his bedroom.

At around 1:00 p.m. the next day, Decedent's mother went to check on him because he had not gotten up yet. She discovered Decedent was dead. Detective William Parks went to the house and saw that Decedent had a puncture mark on his arm that was consistent with injecting heroin with a hypodermic needle. Decedent's father told Detective Parks that Decedent had gone out with Defendant the night before. Detective Parks seized Decedent's cell phone and sent it to the cyber-crime unit. The cell phone revealed Decedent's texts with Defendant about their plans the evening before.

A few days later, Detective Parks went to Defendant's workplace to talk to Defendant about Decedent's death. Defendant agreed to talk to Detective Parks at a nearby police station. Detective Parks drove both himself and Defendant to the police station. Pursuant to safety protocol, Detective Parks handcuffed Defendant on the drive to the police station. When they arrived at the station, the men went to an interview room. Detective Parks read Defendant his

*Miranda*[1] rights, and Defendant said that he understood his rights and waived them by signing a *Miranda* waiver form.

Defendant told Detective Parks about how the men planned to buy heroin, how he picked Decedent up and how they went back to his house and injected heroin. Defendant said that he noticed that Decedent was nodding out[2] and lethargic. The men drove to a movie theatre but decided not to see the movie. They returned to Defendant's house, where Defendant offered Decedent to stay the night so that Defendant could keep an eye on him. Defendant was concerned with Decedent's physical condition because of the amount of heroin that Decedent injected. Nonetheless, Decedent decided to return home because he had a curfew. After relating these details to Detective Parks, Defendant also wrote a statement. Detective Parks took Defendant back to work and told him he would be in contact.

Subsequently, Defendant was charged with distribution of a controlled substance and first-degree involuntary manslaughter. The indictment charged that Defendant "recklessly caused the death of [Decedent] by providing [Decedent] with heroin, knowing [Decedent] intended to inject the heroin into his body." Thirteen days before trial, Defendant filed a pro se motion for a continuance, seeking to replace appointed trial counsel with privately retained counsel. After a hearing, the trial court denied Defendant's motion. The case proceeded to trial.

At trial, Decedent's parents testified about the day that they found Decedent deceased in his bed. Debbie Sloan, a crime scene investigator who reported to the home, testified about taking pictures of the scene and seizing clothes and Decedent's phone. She also testified that there was no drug paraphernalia in Decedent's bedroom. Patrick Jackson, a member of the cyber-crime task force, testified about reviewing Decedent's cell phone and accessing text

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] As Detective Parks explained in his testimony, "nodding out" refers to the effects of heroin when it is first injected. The drug makes the user sleepy before they wake themselves up, only to almost fall asleep again.

messages between Decedent and Defendant. Dr. Mary Case, a forensic pathologist, testified about heroin overdoses, both generally and specifically regarding Decedent. Dr. Case stated that Decedent "could have been saved" had he been given a drug that reverses the effects of heroin. Three forensic toxicologists testified: Jamie Nazzoli, who prepared Decedent's blood and urine samples; Mike Bruder, who tested Decedent's blood and urine; and Christopher Long, who prepared the toxicology report. The toxicologists' testimonies, collectively, related that heroin was found in Decedent's blood and that he most likely died two to six hours after injection.

Detective William Parks also testified at trial. Detective Parks told the jury about the text messages between Decedent and Defendant and how the men planned to buy $70 worth of heroin and inject the drug together later in the evening. Additionally, he testified about his conversation with Defendant on February 2, following Decedent's death. Detective Parks recalled going to Defendant's workplace, asking Defendant if he would speak to him, and driving to the police station to interview Defendant. He further related what Defendant said in his verbal statement, including the following: that Decedent did four buttons of heroin;[3] that "he noticed pretty quickly that [Decedent] was nodding out already, becoming lethargic"; that Decedent was more intoxicated than Defendant anticipated; that Defendant "was concerned for [Decedent's] wellbeing as the night progressed, because of his increased level of intoxication and the lethargy"; and that "[Defendant] was asking [Decedent] to spend the night so he could watch over him, because he was becoming increasingly concerned about [Decedent's] physical condition due to the amount of heroin" that Defendant injected. Detective Parks also read a written statement that Defendant prepared.[4]

---

[3] A button is essentially one dose.

[4] Defendant's written statement differed slightly from Defendant's oral statements to Detective Parks. For example, the written statement reads, "I tried to talk [Decedent] into spending the night because he was concerned that if he

4

At the conclusion of trial, the jury found Defendant guilty of distribution of a controlled substance and first-degree involuntary manslaughter. The court sentenced Defendant to concurrent terms of eighteen years' imprisonment for distribution and fifteen years' imprisonment for involuntary manslaughter. Defendant appeals.

**Standard of Review**

In reviewing a challenge to the sufficiency of the evidence, we consider whether the State introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt. *State v. Hosier*, 454 S.W.3d 883, 898 (Mo. banc 2015). "In determining whether the evidence is sufficient to support a conviction, we view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, and we disregard all contradictory evidence and inferences." *State v. Brown*, 457 S.W.3d 772, 779 (Mo. App. E.D. 2014). We must consider the inferences favorable to the State unless the contrary inference is such that it would necessarily give rise to a reasonable doubt in the mind of a reasonable juror. *State v. Grim*, 854 S.W.2d 403, 413 (Mo. banc 1993).

When reviewing a trial court's ruling on a motion to suppress, our inquiry is limited to whether the court's decision is supported by substantial evidence. *State v. Harris*, 477 S.W.3d 131, 140 (Mo. App. E.D. 2015). We give deference to the trial court's superior opportunity to determine the credibility of the witness and to the court's factual findings. *Id.* This Court views the facts and the reasonable inferences therefrom in the light most favorable to the trial court's decision. *State v. Kelly*, 119 S.W.3d 587, 592 (Mo. App. E.D. 2003). Questions of law are reviewed de novo. *Harris*, 477 S.W.3d at 140. The trial court's ruling on a motion to suppress evidence will be affirmed unless it is clearly erroneous. *Id.*

---

did not [go home], his dad would kick him out of the house," compared to Defendant's oral statement, as recalled by Detective Parks, that he wanted Decedent to spend the night because he was concerned about his physical condition.

5

**Discussion**

*Point I: Sufficiency of the Evidence for*
*Distribution of a Controlled Substance*

In his first point on appeal, Defendant argues that there was insufficient evidence to convict him of distribution of a controlled substance. Specifically, Defendant maintains that Decedent "exercised control over the heroin through" Defendant and, therefore, Decedent constructively possessed the heroin from the moment that Defendant purchased the drug. The State argues that Decedent did not constructively possess the heroin because Defendant and Decedent did not "simultaneously and jointly acquire possession."

Section 195.211 RSMo Supp. 2004 provides, "it is unlawful for any person to distribute, deliver, manufacture, produce or attempt to distribute, deliver, manufacture or produce a controlled substance or to possess with intent to distribute, deliver, manufacture, or produce a controlled substance." Section 195.010(12) RSMo Supp. 2010 defines distribute as "to deliver other than by administering or dispensing a controlled substance." Section 195.010(8) defines deliver as "the actual, constructive, or attempted transfer from one person to another of drug paraphernalia or of a controlled substance, or an imitation controlled substance, whether or not there is an agency relationship, and includes a sale." Regarding constructive possession, § 195.010(34) provides, "A person who, although not in actual possession, has the power and the intention at a given time to exercise dominion or control over the substance either directly or through another person or persons is in constructive possession of it."

Defendant argues that, pursuant to Missouri's statutes defining distribution, Defendant was required to have transferred the heroin to Decedent. Defendant notes that while the term "transfer" has not been defined by statute, the Southern District defined it as: "To convey or remove from one place, person, etc., to another; pass or hand over from one to another;

6

specifically, to change over the possession or control of (as, to transfer a title to land). To sell or give." *State v. Kellner*, 103 S.W.3d 363, 365 (Mo. App. S.D. 2003). Ultimately, Defendant argues that because Decedent constructively possessed the heroin, possession did not "change over" when Defendant brought the heroin to Decedent.

Neither Defendant nor the State cites to Missouri precedent addressing this issue. However, both parties cite to persuasive authority from other jurisdictions to support their arguments. Defendant relies on *State v. Carithers*, 490 N.W.2d 620 (Minn. 1992). In *Carithers*, the defendant purchased heroin, on her own, to share with her husband. *Id.* at 622-24. It was disputed whether the defendant could be guilty of distributing a controlled substance. *Id.* The Minnesota Supreme Court held:

> If a husband and wife jointly acquire the drug, each spouse has constructive possession from the moment of acquisition, whether or not both are physically present at the transaction. The absent spouse could be charged with constructive possession at any time following the purchase by his or her confederate. That the absent spouse did not exercise physical control over the substance at the moment of acquisition is an irrelevancy when there is no question that the absent spouse was then entitled to exercise joint physical possession.

*Id.* at 622. *Carithers* is derived from a Second Circuit Court of Appeals case, *U.S. v. Swiderski*, 548 F.2d 445 (1977). In *Swiderski*, the Court addressed "whether joint purchasers and possessors of a controlled substance, who intend to share it between themselves as users, may be found guilty of the felony of possession with intent to distribute . . . as distinguished from simple possession." *Id.* at 447. The Court held that they cannot. *Id.* In so finding, the Court stated:

> [W]here two individuals *simultaneously and jointly acquire possession* of a drug for their own use, intending only to share it together, their only crime is personal drug abuse simple joint possession, without any intent to distribute the drug further. Since both acquire possession from the outset and neither intends to distribute the drug to a third person, neither serves as a link in the chain of distribution. For purposes of the Act they must therefore be treated as possessors for personal use rather than for further distribution.

*Id.* at 450 (emphasis added).  The Court stated that their holding was "limited to the passing of a drug between joint possessors who simultaneously acquired possession at the outset for their own use." *Id.* at 450-51.

Defendant compares his case to *Carithers* and *Swiderski*.  Defendant claims that Decedent acquired joint possession of the heroin from the time that Defendant purchased the heroin from his drug dealer.  As a result, Defendant argues that he could not have transferred the drug to Decedent.  Defendant asserts that whether or not Decedent accompanied him to purchase the heroin is irrelevant because Defendant purchased the heroin for both himself and Decedent "to save time."

The State differentiates the present case from *Carithers* and *Swiderski*. The State compares the present case to *U.S. v. Wright*, 593 F.2d 105 (9th Cir. 1979), in which the Ninth Circuit held that *Swiderski* was not controlling precedent.  In *Wright*, a woman asked the defendant to buy heroin so they could use it together; she gave the defendant $20 to purchase the heroin but did not tell him where to buy it; the defendant left, bought the heroin, returned, and the woman and the defendant took the drugs together.  *Id.* at 108.  The Court stated that the defendant "did not simply simultaneously and jointly acquire possession of a drug for their (his and another's) own use," but rather the defendant "facilitated the transfer of the narcotic." *Id.* The States argues that the present case is like *Wright*, in that Defendant and Decedent did not simultaneously and jointly acquire possession of the heroin.  Instead, Defendant purchased the heroin upon Decedent's request, bought the heroin on his own, and then transported the heroin to Decedent.  The State contends that Defendant served as a link in the distribution chain of the heroin.

We conclude that Defendant's case is more like *Wright* than *Carithers* and *Swiderski*. In *Swiderski*, the Court focused on the fact that the defendant and his fiancée purchased the illegal drugs together—jointly and simultaneously—in order to ingest the drugs together. 548 F.2d at 450. The defendant and his fiancée did not intend to further distribute the purchased drugs to anyone, and therefore, neither the defendant nor his fiancée served "as a link in the chain of distribution." *Id.* at 450. *Carithers* extended the reasoning of *Swiderski* to apply to situations where a defendant, alone, purchased drugs to share with his spouse. 490 N.W.2d at 622. The factual differences between the present case and both *Carithers* and *Swiderski* lead us to adopt the reasoning laid out in *Wright*.

Here, Defendant and Decedent did not simultaneously and jointly acquire possession of the heroin. The record reveals that while Decedent requested that Defendant purchase the heroin for both men, Defendant was the one who, on his own, purchased the heroin from his drug dealer with his own money and delivered it to Decedent. Given these facts, it is clear that Defendant played "a far more active role than [Decedent] did in the drug transaction; indeed, he acted as a go-between" for Decedent and the drug dealer. *Long v. U.S.*, 623 A.2d 1144, 1148 (D.C. 1993). Accordingly, given the evidence presented at trial, a reasonable juror could have concluded that Defendant was guilty of Count I, distribution of a controlled substance, beyond a reasonable doubt. Point I is denied.

### Points II and III: Sufficiency of the Evidence for
### Involuntary Manslaughter

In his second and third points on appeal, Defendant challenges the sufficiency of the evidence for his conviction for involuntary manslaughter. In Point II, Defendant contends that the evidence was insufficient to prove that he acted recklessly. In Point III, Defendant argues that he did not have a duty to seek medical care for Decedent. The State argues that not only did

9

Defendant recklessly cause the death of Decedent by giving Decedent heroin, but also that Defendant did, in fact, have a duty to seek medical care for Decedent.

Under § 565.024.1 RSMo Supp. 2009, a person commits first-degree involuntary manslaughter if he "recklessly causes the death of another person." Section 562.016.4 RSMo 2000 defines a reckless mental state:

> A person "acts recklessly" or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

In the context of involuntary manslaughter, a person acts recklessly when "there is a conscious disregard of a risk of death to another and such disregard is a gross deviation from what a reasonable person would do in the circumstances." *State v. Beeler*, 12 S.W.3d 294, 297-99 (Mo. banc 2000). "Recklessness resembles knowing conduct in one respect in that it involves awareness, but it is an awareness of risk, that is, of a probability less than a substantial certainty." *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005).

Criminal liability "is premised on a defendant's conduct involving voluntary acts." *State v. Voss*, No. ED101396, 2016 WL 145727, at *6 (Mo. App. E.D. Jan. 12, 2016) (citing *State v. Gargus*, 462 S.W.3d 417, 421 (Mo. App. E.D. 2013)). A voluntary act can be an omission to perform an act. *Id.* However, a defendant cannot be guilty of an offense "based solely upon an omission to perform an act unless the law defining the offense expressly so provides, or a duty to perform the omitted act is otherwise imposed by law." *Id.* (citing § 562.011.4 RSMo 2000). Because Missouri's involuntary manslaughter statute does not explicitly consider a defendant's failure to act, a duty to perform the omitted act must be otherwise imposed by law. *Id.* "[W]here evidence to support a defendant's conviction for first-degree involuntary manslaughter consists of the defendant's affirmative acts as well as his omissions, the defendant may still be found

guilty of the offense even if a duty to perform the omitted act is not otherwise imposed by law."

*Id.*

In the present case, the evidence presented to the jury supporting Defendant's conviction for first-degree involuntary manslaughter consists of Defendant's affirmative acts as well as his omission. As noted, Defendant's conviction may still stand even if we conclude that the duty to perform the omitted act is not imposed by law. Therefore, we must determine whether Defendant had a duty to seek medical care for Decedent, and if so, whether he satisfied said duty (Point III). If we determine that Defendant did not have a duty to seek medical care for Decedent, we still must determine whether the evidence was sufficient to convict Defendant of involuntary manslaughter for his affirmative acts alone, *i.e.*, whether Defendant recklessly caused Decedent's death (Point II).

### A. *Did Defendant have a duty to act?*

As noted, because Missouri's involuntary manslaughter statute does not explicitly consider a defendant's failure to act, a duty to perform the omitted act must be otherwise imposed by law. *Voss*, 2016 WL 145727, at *6; § 562.011.4 ("A person is not guilty of an offense based solely upon an omission to perform an act unless the law defining the offense expressly so provides, or a duty to perform the omitted act is otherwise imposed by law."). There are at least four situations that may give rise to a duty to act: (1) where a statute imposes a duty to care for another; (2) where the defendant stands in a certain status relationship to another; (3) where the defendant assumed a contractual duty to care for another; and (4) where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid. *Gargus*, 462 S.W.3d at 422 (citing *Jones v. U.S.*, 308 F.2d 307, 310 (D.C. Cir. 1962)). A defendant stands in a "certain status relationship" with the victim in cases "where

11

some act or omission on the part of the defendant either created or increased the risk of injury to [another]." *Voss*, 2016 WL 145727, at \*8.

Here, Defendant argues that he did not have a duty to seek medical help for Decedent because none of the situations as laid out in *Gargus* apply to the facts of his case, and specifically that he did not stand in a "certain status relationship" to Decedent. Defendant maintains that even if the law did impose a duty to act, he satisfied any duty by inviting Decedent to stay the night, and once Decedent rejected Defendant's offer, Defendant had no further duty to provide help. The State counters that Defendant did, in fact, have a duty to act because he voluntarily assumed the care of a vulnerable person (Decedent) and Decedent was reliant upon Defendant for medical care.[5]

In *Voss*, this Court held that the defendant had a duty to act because he "created and/or increased the risk of injury to [the victim]" by providing the victim with heroin, suggesting how much heroin the victim should use, helping the victim prepare the heroin for ingestion, and "leaving the hotel room after [the victim] exhibited signs of an overdose which [the defendant] recognized as such." *Voss*, 2016 WL 145727, at \*8. Accordingly, the Court concluded that because the law imposed a duty to act, a reasonable juror could have concluded that the defendant breached said duty by failing to go back to the hotel room or obtain medical help for the victim. *Id.* at \*8.

Here, we cannot conclude that Defendant "created and/or increased the risk of injury" to Decedent. The present case is factually distinguishable from *Voss*, where the defendant played a much more active role in the victim's drug overdose. Unlike *Voss*, Defendant's role in Decedent's heroin use was simply that of distributor. During Defendant's trial, there was no

---

[5] We will assume, without so holding, that any evidence presented about Defendant's acts after Decedent injected heroin were properly considered by the jury.

evidence that Defendant suggested how much heroin for Decedent to use or that Defendant actively helped Decedent ingest the drugs. While we certainly do not condone Defendant's delivery of heroin to Decedent, the present case does not rise to the level of creating or increasing the risk of injury. Under this Court's holding in *Voss*, such a special relationship requires more than just delivery of the heroin. Therefore, we conclude that the law did not impose a duty because Defendant did not create and/or increase the risk of injury to Decedent.

Regardless, we next consider the State's argument that the law imposed a duty because Defendant voluntarily assumed the care of a vulnerable person who was reliant upon him for medical care. This Court's reasoning in *State v. Gargus*, 462 S.W.3d 417 (Mo. App. E.D. 2013), is instructive. In that case, the defendant was convicted of elder abuse following the death of her diabetic, bedbound, eighty-one-year-old mother (the victim). *Id.* at 418. On appeal, the defendant argued that the State failed to present sufficient evidence to support her conviction because she did not have a duty to act to protect the victim. *Id.* at 421. The Court concluded that the defendant voluntarily assumed care of and secluded the victim. *Id.* at 422. However, the Court stated that Missouri law "suggests a duty to act arises, whether or not the defendant has secluded the victim, when the defendant voluntarily assumes the care of a vulnerable person who is dependent upon the defendant for basic necessities, such as food, clothing, shelter, and medical care." *Id.* at 423. The Court concluded that, even if the defendant had not secluded the victim, the defendant had a duty to act because the defendant "voluntarily assumed the care of [the victim], knowing [the victim] was entirely dependent on [the defendant] for her care," and as a result, the defendant had a duty to act reasonably in providing that care. *Id.* at 424. As a result, the Court found there to be sufficient evidence to support criminal liability for the defendant's omissions. *Id.*

Here, it is clear that Defendant did not seclude Decedent. In fact, the evidence shows that Defendant did the opposite—he returned Decedent to his parents' house, where Decedent interacted with his mother. Nonetheless, under *Gargus*, Defendant may have had a duty to act if he voluntarily assumed the care of Decedent and Decedent was dependent upon Defendant for medical care. *Id.* at 423. In *Gargus*, the victim was diabetic, unable to walk, confined to a bed. *Id.* at 419. These particular facts, combined with the "egregious" circumstances giving rise to criminal liability, differ from the present case. *Id.* at 424. Here, we cannot conclude that Defendant voluntarily assumed the care of Decedent and that Decedent was entirety dependent upon Defendant for his medical care. While Defendant and Decedent engaged in drug use together, various other facts established at trial support our conclusion. After Defendant dropped Decedent back at his parents' house, Decedent had a conversation with his mother. Decedent may have started a load of laundry, and then he told his mother that he was tired, said goodnight, and told her that he loved her. These facts, when considered in the context of Decedent's entire evening, show that Decedent was not entirely dependent upon Defendant. Furthermore, Defendant was not the only person with whom Decedent had interactions after ingesting the drugs. Accordingly, we conclude that the law did not impose a duty to act because Defendant did not seclude Decedent, and Decedent was not dependent upon Defendant for medical care.

### B. Were Defendant's affirmative acts reckless?

Having concluded that the law did not impose a duty for Defendant to act, we now turn to whether Defendant's affirmative acts rose to the level of recklessness. Defendant argues that the State did not prove that his actions were reckless because there was no evidence presented at trial that the amount of heroin Decedent injected created a substantial risk of death. The State counters that Defendant acted recklessly by giving Decedent heroin because injecting heroin

14

exposes the user to a substantial and unjustifiable risk of death, Defendant was aware of this risk, and Defendant consciously disregarded the risk by giving Decedent heroin.

As noted previously, a person acts recklessly when "there is a conscious disregard of a risk of death to another and such disregard is a gross deviation from what a reasonable person would do in the circumstances." *Beeler*, 12 S.W.3d at 297-99. "Recklessness resembles knowing conduct in one respect in that it involves awareness, but it is an awareness of risk, that is, of a *probability* less than a substantial certainty." *Belton*, 153 S.W.3d at 309 (emphasis added). In the present case, Defendant's affirmative act was delivering heroin to Decedent. Accordingly, it was incumbent upon the State to prove, beyond a reasonable doubt, that Defendant was aware of the risk that Decedent's death was probable as a result of injecting heroin. The evidence presented at trial, specifically the testimony of Dr. Mary Case, the forensic pathologist, established the following: she had seen many heroin overdoses; doctors are not permitted to dispense heroin; and heroin is highly addictive. Dr. Case did not specifically address whether or not the dose ingested by Decedent created a known probability that Decedent would die; rather, Dr. Case spoke generally about the inherent dangers of heroin use. Given the lack of concrete evidence establishing that the amount of heroin injected by Decedent created a substantial risk of death, we cannot conclude that the evidence was sufficient to support Defendant's conviction. While we recognize the concern of the heroin epidemic and the rise in deaths as a result of heroin use, the State failed to provide sufficient evidence that death by injecting heroin is a "probability less than a substantial certainty." *Belton*, 153 S.W.3d at 309.

Further, we note the factual differences between the present case and *Voss*, in which we concluded that the defendant's affirmative acts were reckless. In *Voss*, the defendant's affirmative acts consisted of more than providing heroin to the victim. Beyond providing the

15

drugs, the defendant also suggested the amount of heroin for the victim to use, helped the victim prepare the heroin by crafting a beer can and mixing the heroin with water and heating it, and loaded the heroin into a syringe. In the present case, there was no evidence presented to the jury that Defendant played such an active role in Decedent's heroin injection. To rule as the State suggests and hold that Defendant acted recklessly simply by providing Decedent with heroin would create a per se involuntary manslaughter rule, which we are unwilling impose upon criminal defendants absent clear legislative intent.[6]

Accordingly, we conclude that the evidence was insufficient to convict Defendant of involuntary manslaughter. The State not only failed to prove that Defendant had a duty to provide medical care for the Decedent, but also that Defendant's actions were criminally reckless. Therefore, Defendant's conviction for involuntary manslaughter cannot stand, and we grant his claim of error. We reverse the trial court's judgment on Count II, involuntary manslaughter, and vacate Defendant's conviction on that count.[7]

### Point V: Admissibility of Defendant's Statements to Police

In his fifth point on appeal, Defendant argues that the trial court erred in overruling his motion to suppress his oral and written statements to Detective Parks. Specifically, Defendant alleges that the submission of these statements violated his Fourth Amendment rights, in that Detective Parks illegally made a *de facto* arrest of Defendant without probable cause. The State counters that Defendant was not under arrest and that his statements were voluntary.

---

[6] We note that other state legislatures, in confronting the rising number of heroin overdose deaths, have created strict liability criminal statutes for defendants who deliver lethal drugs to victims who subsequently die. *See, e.g,*, 18 PA. CONS. STAT. § 2506 (2014); WYO. STAT. ANN. § 6-2-108 (2010); KAN. STAT. ANN. § 21-5402 (2013); 720 ILL. COMP. STAT. 5/9-3.3(a) (2008).

[7] Because we reverse the judgment and vacate Defendant's conviction of involuntary manslaughter, we need not address Defendant's argument, contained in Point III, that the indictment was insufficient to charge Defendant with involuntary manslaughter for failure to act. Additionally, given our disposition of Points II and III, we deny as moot Defendant's Point IV, a claim of plain error regarding the trial court's failure to *sua sponte* declare a mistrial based upon the State's closing argument at trial.

16

In support of his argument, Defendant cites to *State v. Pfleiderer*, 8 S.W.3d 249 (Mo. App. W.D. 1999). In *Pfleiderer*, an officer had reasonable suspicion to subject the defendant to an investigative *Terry*[8] stop. 8 S.W.3d at 254. The defendant argued that the officer detained him for longer than necessary and, as a result, the police placed him under *de facto* arrest. *Id.* at 255. The Court, in addressing when a *Terry* stop turns into a *de facto* arrest, stated:

> Even if no formal arrest is made, a *de facto* arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop. In deciding whether this standard is met, we look at whether the police used the least intrusive means of detention reasonably necessary to achieve their investigative purpose. The factors to be considered in determining whether police conduct constitutes a *de facto* arrest include the duration of the stop, whether the suspect was handcuffed or confined in a police car, whether the suspect was transported or isolated, and the degree of fear and humiliation that the police conduct engenders.
>
> If an arrest is made, either expressly or *de facto,* it must be based on probable cause. Without probable cause, an arrest is illegal. Probable cause exists when the arresting officer is aware of facts and circumstances that are reasonably trustworthy and would lead a person of reasonable caution to believe an offense had been committed. If the government does not argue that the officers had probable cause[,] if we find an arrest, we must find error in the failure to suppress [evidence] as the fruit of the illegal seizure.

*Id.* at 255-56 (internal quotations and citations omitted).

Here, applying the factors as provided in *Pfleiderer*, Defendant argues that he was placed under *de facto* arrest because of the following: the "significant" length of time of his interview with Detective Parks; Defendant was handcuffed while in Detective Park's car; Defendant was transported from his place of work to the police station; and the humiliation of being handcuffed and escorted, in a police car, away from his place of employment. Defendant maintains that because this amounted to a *de facto* arrest, it must have been supported by probable cause. Defendant argues that Detective Parks did not have probable cause, and that the State never argued that Detective Parks had probable cause to arrest Defendant.

---

[8] *Terry v. Ohio*, 392 U.S. 1 (1968).

However, Defendant fails to address a crucial fact included in the record—that Defendant was not subjected to an investigative *Terry* stop but rather voluntarily went with Detective Parks to the police station to be interviewed. The present case is more analogous to the cases cited by the State, *State v. Glass*, 136 S.W.3d 496 (Mo. banc 2004), and *State v. Hill*, 247 S.W.3d 34 (Mo. App. E.D. 2008). In *Glass*, the Missouri Supreme Court noted:

> A person who voluntarily accompanies officers to the police station for questioning is not subject to arrest-like restraints. If a person is free to go at any time prior to the actual arrest, then the person is not under "arrest." The issue turns on whether the seizure is sufficiently like arrest to invoke the traditional rule that arrests may constitutionally be made only on probable cause. Police are simply not required to have probable cause to interrogate persons who are neither formally arrested nor "seized"—that is, persons who are not subject to arrest-like restraints.

*Glass*, 136 S.W.3d at 509 (internal citations omitted). Turning to the facts presented in *Glass*, a non-uniformed police officer engaged the defendant in a conversation outside of the defendant's home. *Id.* at 509. The police officer asked the defendant to accompany him to the police station to provide a written statement. *Id.* The defendant agreed to do so, and another police officer drove the defendant to the station. *Id.* On the way, the defendant was able to purchase cigarettes, and during the interview, the defendant was given food and was permitted to smoke a cigarette unaccompanied by officers. *Id.* The Court concluded that based upon these facts, it was clear that the defendant was not under arrest, *de facto* or otherwise. *Id.* In *Hill*, this Court noted the following facts: the defendant voluntarily went to the police station for an interview; he was told he was not under arrest and was free to leave; he was not physically restrained during the interview; the interview lasted about an hour; and the defendant was not arrested after the interview. 247 S.W.3d at 51-52. The Court concluded that, under those circumstances, a reasonable person "would not have understood the situation to be one of custody." *Id.* at 51.

18

In the present case, given the evidence presented at trial, a reasonable person would not have believed he was in custody, nor was the "seizure" of Defendant sufficiently like an arrest. When Detective Parks went to Defendant's workplace, he was in an unmarked police car and was not in uniform. Defendant agreed to accompany Detective Parks to the police station. We recognize that generally, when placed in handcuffs, a reasonable person would believe that he is not free to leave and is under arrest. *Peters v. Dir. of Revenue*, 35 S.W.3d 891, 896 (Mo. App. S.D. 2001). However, Detective Parks informed Defendant that he was only handcuffing him in accordance with safety protocol. *See Jones v. Dir. of Revenue*, 2014 S.W.3d 709, 712 (Mo. App. W.D. 2006) ("An officer's handcuffing a suspect alone does not constitute an arrest when the officer's purpose is to ensure his safety."). Defendant did not object to being handcuffed. There was no evidence that Detective Parks questioned Defendant in the car. Defendant was not handcuffed during the interview, and the interview lasted only 30 minutes. At no point in the record is there evidence that Defendant wished to leave the interview or that Detective Parks forced Defendant to stay and speak with him. Like in *Glass*, Defendant was not arrested after the interview. Under these unique circumstances, where Defendant voluntarily acquiesced to a brief restraint, in accordance with safety protocol, while accompanying Detective Parks to the police station for an interview, we cannot conclude that Defendant was subjected to an illegal, *de facto* arrest. Therefore, the trial court did not err in concluding that Defendant's statements were admissible and denying Defendant's motion to suppress. Point V is denied.

### Point VI: Denial of Defendant's Motion for Continuance

In his final point on appeal, Defendant argues that the trial court plainly erred by denying his pro se motion for a 90-day continuance so that he could hire private counsel. Defendant maintains that this ruling violated his right to counsel, because he had an "irreconcilable

19

conflict" with trial counsel. The State counters that Defendant failed to prove that there was an irreconcilable conflict.

Defendant concedes that he did not preserve this claim of error in his motion for new trial and, therefore, requests plain error review under Rule 30.20.[9] Under this standard, we will reverse only if a plain error affecting substantial rights results in manifest injustice or a miscarriage of justice. *State v. Floyd*, 347 S.W.3d 115, 123–24 (Mo. App. E.D. 2011). We review for plain error using a two-step analysis. "First, we determine whether the record facially establishes substantial grounds to believe plain error occurred, which is error that is evident, obvious, and clear." *State v. Houston*, 467 S.W.3d 894, 899 (Mo. App. E.D. 2015). If so, we then consider whether the error resulted in manifest injustice or a miscarriage of justice. *Id.* Plain error review requires that the alleged error have a decisive effect on the verdict. *Id.* However, we will decline to exercise our discretion to review a claim of plain error if we conclude that facially substantial grounds do not exist. *Id.* at 899-900.

A trial court's decision to deny a motion for continuance to allow a party to obtain different counsel is discretionary. *State v. Rice*, 249 S.W.3d 245, 251 (Mo. App. E.D. 2008). To obtain a change of attorney on the eve of trial, a defendant must show an "irreconcilable conflict" with counsel, which is a total breakdown in communication between the defendant and his attorney. *State v. Parker*, 886 S.W.2d 908, 929 (Mo. banc 1994). Disagreement about defense strategy does not qualify as a total breakdown in communication. *Id.* Although a defendant has a right to counsel, he is not entitled to the aid of a particular attorney. *Rice*, 249 S.W.3d at 251. The right to be represented by counsel of one's own choosing is qualified by the public's right to the effective and efficient administration of justice. *Id.*

---

[9] Missouri Supreme Court Rules (2015).

In the present case, Defendant filed a pro se motion to withdraw counsel on March 27, 2014. The trial court held a hearing on April 3, 2014, six days before Defendant's scheduled trial. At the hearing, Defendant requested a 90-day continuance, because he sought to replace his appointed public defender with private counsel. Defendant sought the continuance because he needed time to raise money to retain private counsel. Defendant alleged that he was unhappy with trial counsel because she did not file a motion to sever the two counts. The State opposed Defendant's motion because "it was not easy to get" two doctors scheduled to testify at trial. The trial court denied Defendant's motion, concluding that it was "not in the interest of justice" for the trial court to allow for a continuance.

We conclude that the record does not facially establish substantial grounds to believe plain error occurred because there is no "evident, obvious, and clear" error. *Houston*, 467 S.W.3d at 899. Here, Defendant did not show that he had an "irreconcilable conflict" with his trial counsel. Defendant's complaints regarding trial counsel's failure to file a motion to sever was a matter of trial strategy, as trial counsel explained at the April 3 hearing. As noted, disagreements about defense strategy do not amount to "a total breakdown in communication." *Parker*, 886 S.W.2d at 929. Accordingly, because we conclude that facially substantial grounds establishing error do not exist, we decline to exercise our discretion to review Defendant's claim. Point VI is denied.

**Conclusion**

Given the foregoing, we affirm Defendant's conviction of Count I, distribution of a controlled substance. We reverse and vacate Defendant's conviction of Count II, involuntary manslaughter.

_____
Philip M. Hess, Judge

Lisa S. Van Amburg, C.J. and
Kurt S. Odenwald, J. concur.

22